579 F.2d 152
 Thomas TURPIN, Plaintiff-Appellant,
v.
Joseph MAILET and John Doe, Individually and as police
officers of the Police Department of the City of
West Haven, and City of West Haven, Defendants,
and
City of West Haven, Defendant-Appellee.
 No. 317, Docket 77-7345.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 27, 1978.
Decided June 5, 1978.
 
 Michael Avery, Boston, Mass. (John R. Williams and Williams, Wynn & Wise, New Haven, Conn., of counsel), for plaintiff-appellant.
 Paul A. Scholder, New Haven, Conn., for defendant-appellee.
 Before KAUFMAN, Chief Judge, and FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, GURFEIN, VAN GRAAFEILAND and MESKILL, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 With the ratification of the fourteenth amendment in 1868, Congress and the judiciary embarked on a century-long journey to transform the mere words of the amendment into an instrument capable of protecting those injured by illegal state action. The legislative branch moved first and with dispatch in enacting the Civil Rights Bill of 1871, whose overarching provisions charted broad expanses of the new constitutional territory. Courts, on the other hand, through the characteristically measured process that marks the restrained exercise of judicial power, proceeded slowly, yet deliberately, to effectuate the congressional and constitutional design. We are asked on this appeal to move one step further in fulfilling the promise of the fourteenth amendment by recognizing that, in certain instances, municipalities may be held liable in damages for actions taken in derogation of that amendment. Cognizant of our responsibility to develop remedies implementing fundamental constitutional provisions, we proceed with our task.
 
 I.
 
 2
 In order to understand the complex legal issues presented by this case, its relatively simple facts must be traversed initially.[1] During the early evening hours of September 18, 1971, two teenage girls were involved in an altercation when one allegedly began to choke the other. Denise Stiles managed to free herself from her friend's grasp, and ran home to tell her mother, Jean Stiles Pasano, about the incident. Mrs. Pasano immediately reported her daughter's story to the West Haven police force, and two of its officers, Christopher Columbus Skeens and Robert J. Weber, began their search for the girl's alleged "attacker," Nancy Guckin. Near the corner of Noble Street and Washington Avenue in West Haven, Patrolman Weber spotted a group of teenagers, and learned that one of their number was Nancy.
 
 
 3
 After identifying the girl, Weber began to escort her to the patrol car. When she screamed for help, the assembled youngsters shouted their protests at Weber, and fifteen-year-old Thomas Turpin, one of the onlookers, attempted to come to her aid. As Turpin approached the car, Officer Skeens grabbed him from behind and, according to Turpin, clubbed him on the back of his skull with a nightstick. The resulting laceration was treated at a nearby hospital and required six stitches.
 
 
 4
 On November 7, 1972, Turpin filed suit against Skeens in federal court, claiming that the officer had used excessive force in restraining him, and thereby violated his civil rights under 42 U.S.C. § 1983. During the course of the trial, Officer Skeens contended that he and Weber merely threw Turpin aside, and that the youngster had sustained his head injury by striking the left rear side of the police car. Judge Newman, who tried the case without a jury, credited Turpin's version of the incident, which was corroborated by the testimony of six eyewitnesses. He awarded the youngster $3,500 in damages, a sum ultimately paid by the insurance carrier for the City of West Haven. The decision was publicized in the community and discussed by members of the West Haven Police Department. Turpin claims that this resulted in widespread animosity generated against him among the officers.
 
 
 5
 Spurred by the general interest in the case, the Board of Police Commissioners met to discuss Judge Newman's decision. Ultimately, the Board decided against disciplining Skeens, in spite of the court's determination that he had used excessive force. Indeed, Skeens was subsequently promoted. Turpin alleges that this action by the Board served to encourage members of the West Haven Police Department to believe that they could violate his civil rights with impunity.
 
 
 6
 This attitude, Turpin suggests, triggered the incident which lies at the heart of the instant lawsuit. On May 6, 1975, less than three months after Judge Newman's decision, Turpin was leaving Pickering's Store on the corner of Campbell Avenue and Noble Street in West Haven at about seven-thirty in the evening when he saw his friend, Walter Edwards, and decided to join him. The two companions, Turpin asserts, were standing there peacefully when Joseph Mailet, a West Haven police officer, recognized Turpin. Mailet, allegedly acting out of malice stemming from Turpin's successful suit against Skeens, arrested Turpin and Edwards for disorderly conduct. Officer Leslie Sweetman, who was parked in his squad car nearby, assisted Mailet with the arrest. After Turpin was processed and detained at the offices of the West Haven Police Department, he was released on a nonsurety bond. One month later, on June 12, 1975, a Nolle prosequi was filed by an assistant prosecuting attorney, thus terminating the proceedings against Turpin.
 
 
 7
 Turpin, claiming that the arrest violated his civil rights, commenced the instant action against the officers and the City of West Haven on July 25, 1975. Insofar as the two police officers were charged with wrongdoing, Turpin's suit was based on the provisions of 42 U.S.C. §§ 1983 and 1988, with federal jurisdiction asserted under 28 U.S.C. § 1343(3). The action against the City, on the other hand, was brought directly pursuant to the provisions of the fourteenth amendment, with jurisdiction grounded in 28 U.S.C. § 1331 the general federal question provision. Pendent claims against the City based on Connecticut law were also asserted.[2] Turpin sought a compensatory recovery of $100,000, and an additional $100,000 in punitive damages.
 
 
 8
 The City moved for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, claiming that Turpin failed to state a claim against it. Judge Newman adopted the findings of Magistrate Arthur H. Latimer on this issue. The Judge held that, under the circumstances presented, a right of action could not be implied directly from the fourteenth amendment. He also dismissed the pendent state claims. Turpin, seeking an instant appeal, then moved successfully for the entry of a final judgment on the claims against the City under Rule 54(b) of the Federal Rules of Civil Procedure, the action against the individual defendants still continuing. In granting Turpin's motion, Judge Newman noted that over 30 lawsuits in the District of Connecticut presented claims similar to that pressed against the City of West Haven. This appeal was, accordingly, allowed.[3]
 
 II.
 
 9
 Turpin's decision to proceed against the City directly under the fourteenth amendment, invoking the jurisdictional provisions of 28 U.S.C. § 1331, results, of course, from judicial interpretations of 42 U.S.C. § 1983, the modern day codification of Section 1 of the Civil Rights Act of 1871. In 1961, the Supreme Court decided that § 1983 could not be used to impose liability in damages upon municipalities. Monroe v. Pape, 365 U.S. 167, 187-91, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). After an analysis of the provision's legislative history, Justice Douglas wrote that Congress could not have intended to include municipalities among the class of "persons" capable of being sued under the statute.[4] Subsequently, the rationale of Monroe was logically extended to preclude § 1983 injunctive actions against municipalities.[5] City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Accordingly, individuals seeking relief against municipalities for the deprivation of their civil rights have often turned directly to the fourteenth amendment. They have relied on the principle expounded in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), that, even in the absence of a statutory right of action, courts have the power to fashion common law remedies for constitutional wrongs.[6]
 
 
 10
 The facts in Bivens are enlightening. Six agents of the Federal Bureau of Narcotics were alleged to have invaded Webster Bivens's apartment without the authority of either a search or arrest warrant. If the charges were true, the conduct of the agents violated the fourth amendment. No remedy, however, was apparently available to Bivens for this violation of his constitutional rights. Since only employees of the federal government were involved, 42 U.S.C. § 1983, which, by its terms, applies only to "state action," was rendered inapplicable. And the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671-80, which would otherwise allow suits against the United States, then exempted all intentional torts.[7] In sum, if Bivens was to be accorded any federal relief, his only recourse would be a damage action under the fourth amendment. Justice Brennan gave short shrift to the argument that petitioner should be relegated to his state remedies, noting,
 
 
 11
 "(W)here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." Bell v. Hood, 327 U.S. at 684, 66 S.Ct. 773.
 
 
 12
 Bivens, supra, 403 U.S. at 392, 91 S.Ct. at 2002. He went on to stress that damages have historically been regarded as the ordinary remedy for an invasion of personal interests in liberty.
 
 
 13
 Few opinions have stirred as much debate as Bivens. It has led commentators to explore not only the precise scope of its holding but, more fundamentally, to inquire into the respective roles of Congress and the courts in fashioning remedies for constitutional wrongs. And it is clear to us, and to many others, that judicial power to redress constitutional grievances is not limited to the fourth amendment. Bivens, if anything, established that damages could flow from injuries caused by an invasion of other constitutional provisions.[8] See Note, Remedies for Constitutional Torts: "Special Factors Counselling Hesitation", 9 Ind.L.Rev. 441, 449 (1976). Indeed, its rationale has been applied to cases arising under the first,[9] fifth,[10] sixth,[11] eighth,[12] ninth,[13] and fourteenth[14] amendments.
 
 
 14
 Underlying the evident readiness of courts to imply a remedy is the recognition, seldom clearly expressed, that the courts are doing no more than fulfilling their traditional common law function. See Monaghan, The Supreme Court, 1974 Term Foreword: Constitutional Common Law (hereinafter cited as Monaghan), 89 Harv.L.Rev. 1 (1974). Where Congress does not provide any remedy for the vindication of a right guaranteed by the Constitution, the Constitution itself may Require that the exercise of judicial power fill the void. See Kostka v. Hogg, 560 F.2d 37, 44-45 (1st Cir. 1977). In most instances, however, courts are free to imply remedies where the relief requested is merely appropriate to the vindication of the interest asserted. When one analyzes Bivens, he is driven to the conclusion that Bivens Decided that precise issue. The Court refused to accept the premise that a remedy must be necessary or indispensable to warrant its implication:
 
 
 15
 The question is merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts. Cf. J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142 (1933).
 
 
 16
 403 U.S. at 397, 91 S.Ct. at 2005. In such instances, courts are doing no more than creating structures for enforcement similar to those normally fashioned by legislatures. Monaghan, Supra, 89 Harv.L.Rev. at 28; Hill, The Bill of Rights and the Supervisory Power, 69 Colum.L.Rev. 181 (1969).
 
 
 17
 It is too late in the day to question whether the court can act in this fashion even in the absence of express congressional authorization. The development of the exclusionary rule and the required provision of Miranda warnings might well be examples of "common law" development.[15] In his concurrence in Bivens, Justice Harlan recognized the appropriateness of this role for the courts, and likened judicial rulemaking to legislative activity:
 
 
 18
 In resolving that question, it seems to me that the range of policy considerations we may take into account is at least as broad as the range of those a legislature would consider with respect to an express statutory authorization of a traditional remedy.
 
 
 19
 403 U.S. at 407, 91 S.Ct. at 2010. The soundness of Justice Harlan's reasoning may be found in the explanation that the courts are not really impinging upon congressional authority when they act in the manner under discussion.[16]
 
 
 20
 In assuming its common law role, the court invigorates the political process. As Professor Monaghan has aptly noted, "the Court, in effect, opens a dialogue with Congress but one in which the factor of inertia is now on the side of individual liberty." Monaghan, Supra, 89 Harv.L.Rev. at 29. The legislature, at the least, becomes sensitive to those areas in which its own remedial scheme is lacking, and can use the court's determination as a focal point for the re-examination of the policy questions involved.[17]
 
 III.
 
 21
 The fourteenth amendment provides an apt context for the application of the court's common law powers. At its inception, the principles underlying the amendment were heralded as "the very spirit and inspiration of our system of government, the absolute foundation upon which it was established."[18] If the judicial branch has an obligation, independent of Congress, to enforce the terms of any constitutional provision, certainly the fourteenth amendment should be foremost among them.
 
 
 22
 The City of West Haven suggests, nonetheless, that the language of the amendment requires a contrary result. It argues that since Section five[19] explicitly accords Congress "the power to enforce by appropriate legislation" the provisions of the Amendment, the courts are precluded from doing so.[20] In addition, the City contends that the first four substantive sections are little more than precatory.
 
 
 23
 To support this proposition, it resurrects dicta nearly a century old from Ex Parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880). The Court there indicated its acceptance of a severely restricted view of judicial power under the fourteenth amendment, going so far as to suggest that courts lack the power to declare state legislation in conflict with the fourteenth amendment. 100 U.S. at 345, 347. Almost a quarter century has passed since the Supreme Court's landmark opinion in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and it can no longer seriously be contended that the judiciary is relegated to so meager a role in enforcing the terms of the amendment.[21] Brown and its progeny demonstrate that courts have and will play an enormous role in fashioning equitable remedies under the fourteenth amendment. And the courts have been anything but meek in requiring states and municipalities to reshape their institutions to conform with the dictates of the Constitution. See generally Chayes, The Role of the Judge in Public Law Litigation, 89 Harv.L.Rev. 1281 (1976). Since the language of the amendment does not suggest any distinction between the propriety of according equitable relief and damages,[22] we fail to see how any differentiation of substance between the forms of relief can be justified.
 
 
 24
 The position taken by the City of West Haven also does not find any support in the legislative history of the amendment. The first draft of the provision was framed only in terms of a grant of power to Congress to secure the privileges and immunities of state citizens and equal protection for all persons.[23] After three days of debate in the House of Representatives, it became clear that this original language could not secure enough votes for passage. B. Schwartz, Statutory History 191. A revised draft was then introduced, whose five sections contained not only a grant of power to Congress but a series of substantive prohibitions against the states. The significance of the change is that the proposed amendment incorporated four self-executing provisions barring the states from restricting civil rights. Representative Bingham, the author of the amendment, explained the import of the modification in subsequent debates on the Civil Rights Act of 1871:
 
 
 25
 Well might the gentleman inquire, as he does today, "What means that language if we adopted the amendment without power to enforce it?" . . . .Mr. Speaker, allow me to say, further, that by the text of the Constitution as you remember it, and as all thoughtful Representatives remember it, there are negative limitations upon the power of the States; as, for example, that no state shall make an Ex post facto law; . . . .
 
 
 26
 These are of the negative limitations on the power of the States in the original text of the Constitution. Does the gentleman undertake to tell me that they have not always been enforced against state constitutions and state statutes, and the judgment of the highest courts of the States, in the Supreme Court, under the twenty-fifth section of the act of 1789? Why sir, if I were to read the decisions that have been made in the exercise of this very power, under that law, enforcing these negative prohibitions upon States, the sun would go down before I had read even a syllabus of the cases. B. Schwartz, Statutory History 304-05.
 
 
 27
 Moreover, if we were to accept the City's argument that, independent of legislative action, courts lack the power to compel compliance with constitutional provisions containing congressional enforcement clauses, we would be emasculating much of the modern Constitution. An express grant of power to the legislative branch is not peculiar to the fourteenth amendment. It is contained in the thirteenth, fifteenth, eighteenth, nineteenth, twenty-third, twenty-fourth, and twenty-sixth amendments as well. Indeed, that language is also a part of the proposed equal rights amendment.
 
 
 28
 In rejecting the proposition that Section five is an implicit limitation on the court's powers, we do, of course, recognize that the enforcement provision has been accorded a special role in the constitutional framework. Congressional enactments empowered by Section five can override the proscriptions of the eleventh amendment, See Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976),[24] and perhaps even the tenth amendment, See National League of Cities v. Usery, 426 U.S. 833, 852 n.17, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).[25]
 
 IV.
 
 29
 Bivens instructs us, then, that this court has the power to imply a remedy for violations of the fourteenth amendment. Bivens expressly cautioned, however, that courts should tread warily when confronted with an "explicit congressional declaration" antithetical to the existence of a cause of action. Indeed, many courts, adhering to this proposition, have refused to allow recourse against municipalities for violations of the fourteenth amendment, asserting that Congress manifested its antipathy to such actions during the debates surrounding the passage of the Civil Rights Act of 1871 (now, § 1983). See, e.g., Kostka v. Hogg, 560 F.2d 37 (1st Cir. 1977); Pitrone v. Mercadante, 420 F.Supp. 1384 (E.D.Pa.1976); Smetanka v. Borough of Ambridge, 378 F.Supp. 1366 (W.D.Pa.1974); Perzanowski v. Salvio, 369 F.Supp. 223 (D.Conn.1974). Cf. Crosley v. Davis, 426 F.Supp. 389 (E.D.Pa. 1977).
 
 
 30
 Critics of implication rely primarily on the rejection of the Sherman Amendment in 1871. See Monroe v. Pape, 365 U.S. 167, 188, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). This amendment would have imposed strict liability upon municipalities for almost any form of private organized violence. It is worthwhile to recite the endless reach of that language, for so much has been made of the rejection of the Sherman Amendment:
 
 
 31
 That if any house, tenement, cabin, shop, building, or granary shall be unlawfully or feloniously demolished, pulled down, burned, or destroyed, wholly or in part, by Any persons riotously and tumultuously assembled together . . . the county, city, or parish in which any of the said offenses shall be committed shall be liable to pay full compensation to the person or persons damnified by such offense.
 
 
 32
 Cong. Globe, 42d Cong., 1st Sess., p. 663 (emphasis added). Counties, cities and parishes, responsible for violence committed within their confines, even by non-residents, would have been transformed into guarantors of the public peace. The amendment passed the Senate, but was twice rejected by the House of Representatives.
 
 
 33
 The Supreme Court, in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), relied on the rejection of the Sherman Amendment in holding that municipalities are not "persons" for the purposes of § 1983. Justice Douglas, in plumbing the source of the apparent congressional antagonism to municipal liability, suggested it derived from the legislature's fear that it had "no constitutional power to impose any obligation upon county and town organizations, the mere instrumentality for the administration of state law." 365 U.S. at 190, 81 S.Ct. at 485.
 
 
 34
 Others have found alternative explanations in the legislative history for the rejection of the amendment. Some representatives, for example, were not willing to accept a measure so extreme as to impose liability for purely private acts. Others were of the view that the proliferation of such damage actions might well bankrupt municipal treasuries. Nearly all the objections to the amendment adverted to its breadth and its dubious constitutionality. See Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922, 945-51 (1976); Comment, 57 Calif.L.Rev. 1142, 1164-70 (1969). Certainly, it is difficult to draw any reasoned conclusion regarding Congress's attitude toward municipal liability for the constitutional torts of public employees from the fate of the Sherman Amendment.[26]
 
 
 35
 Some who have accepted the notion that § 1983 evidences an explicit policy against judicial imposition of liability upon municipalities, most notably the First Circuit in Kostka v. Hogg, 560 F.2d 37 (1st Cir. 1977), do not merely rely on the 1871 debates and Monroe. Substantial emphasis is placed on two recent decisions by the Supreme Court, Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) and Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), both addressing issues left unresolved by Monroe. The opinions, however, ultimately add little to the Monroe analysis. In Aldinger, where an action had been brought under § 1983 against several officers of Spokane County, an attempt was made to have the federal court exercise pendent jurisdiction over state claims against the County itself. The sole initial source of jurisdiction was § 1343(3), the jurisdictional counterpart of § 1983. The Court declined to adopt this "pendent party" theory, basing its decision, in part, on a determination that such an outcome would conflict with § 1983:
 
 
 36
 Parties such as counties, whom Congress Excluded from liability in § 1983, and thereby by reference in the grant of jurisdiction under § 1343(3), can argue with a great deal of force that the scope of that "civil action" over which the district courts have been given statutory jurisdiction should not be so broadly read as to bring them Back within that power merely because the facts also give rise to an ordinary civil action against them under the law.
 
 
 37
 427 U.S. at 17, 96 S.Ct. at 2421. Given that Congress did not view § 1983 as authorizing suits against municipalities (for whatever reasons), the Court correctly perceived the anomaly of bootstrapping state claims into a federal court by the use of § 1983's penumbra of pendent jurisdiction.
 
 
 38
 In Moor, the Court was presented with the question whether § 1988, enacted to fill "gaps" in the federal civil rights law through the adoption of appropriate provisions of state law, should be construed to permit a type of liability explicitly rejected in the § 1983 debates. The petitioners in that case sought to incorporate into federal law California statutory provisions making a county vicariously liable for the wrongful acts of its employees. The limited issue presented, as characterized by Justice Marshall for the Court, was whether in " § 1988 Congress has effectively mandated the adoption of California's law of vicarious liability into federal law." 411 U.S. at 701, 93 S.Ct. at 1791. In rejecting this contention, the Court observed that the judicial implication of remedies under § 1988 should be "restricted to those contexts in which Congress has in fact authorized resort to state and common law." Id. In short, Moor stands for the not particularly remarkable proposition that Congress itself should not be viewed as authorizing, under a remedial provision, measures it elsewhere declined to adopt.[27]
 
 
 39
 The Court's rejection of attempts to expand the scope of § 1983 through the back door, by a forced interpretation of other statutory enactments, does not reflect Congress's antipathy to the remedy in question. To accept the "antipathy" argument would lead us into a Cul de sac. We would be forced to accept the objectionable concept that Congress's failure to provide a remedy for every conceivable constitutional violation demonstrates a belief by Congress that certain injustices must remain unredressed. As Professor Nowak points out,
 
 
 40
 (W)hile the Civil Rights Bill of 1871 was sweeping in scope, it was considered to be a first step in the enforcement of the principles of the fourteenth amendment. . . . Thus, it would seem that the proponents of the bill intended to provide civil and criminal sanctions against individuals who engaged in activities designed to deprive some individuals of the rights guaranteed by the amendment and thought it advisable to see if these provisions were effective before determining whether any sanctions against governmental bodies were needed in order to enforce the amendment.
 
 
 41
 Nowak, Congressional Power, 75 Colum.L.Rev. at 1467. Professor Nowak's thesis has much to commend it. Section 1983 represented Congress's initial foray into the area of civil rights. That it was wary of going too far Ab initio should not be read as an intention to create a prohibition In perpetuo against judicial action expanding the scope of available relief.
 
 
 42
 In similar fashion, we are not persuaded to a contrary result by the fact that various bills introduced in Congress to supplant the rule of Monroe v. Pape have failed to gain passage.[28] In reviewing these inchoate legislative acts, it is difficult, if not impossible, to derive from them a definitive determination of legislative intent.[29] While it is true that Congress has had 16 years to overrule Monroe, we fail to see how congressional inaction in this area would abridge our powers under Bivens. It is an exercise in frustration to attempt to read meaning into Congress's inactions in this and so many other areas that, as courts have suggested time and again, cry out for its action. We do not pretend to understand how Congress devises its priorities. And, if we may hazard a conjecture, it is likely that Congress will not move with haste, or, indeed, at all, to negate our ruling today.
 
 
 43
 In sum, we take issue with those who find guidance in congressional inaction. Congress acts only by affirmatively passing laws, a process which requires the concurrence of both Houses, and, in most instances, the approval of the President. Admittedly, in interpreting an enacted provision, it may be appropriate to review the legislative history of the measure, including provisions that were earlier rejected. There, of course, one is merely determining congressional intent as embodied in positive law. Nothing in this principle, however suggests that legislative silence[30] can in any way be viewed as an expression of congressional "intent," let alone the sort of "explicit congressional declaration" required by Bivens. As the Supreme Court has observed, "(t)he search for significance in the silence of Congress is too often the pursuit of a mirage." Scripps-Howard Radio v. FCC, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942). See generally H. M. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1381-1401 (tent. ed. 1958); Mishkin, Some Further Last Words on Erie the Thread, 87 Harv.L.Rev. 1682, 1687-88 (1974).
 
 V.
 
 44
 In light of the express reservation by the Supreme Court of the question before us, Mt. Healthy City School District v. Doyle, 429 U.S. 274, 277-78, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977),[31] and our view that we have the power to imply a remedy under the fourteenth amendment, we must proceed to evaluate the "appropriateness" of subjecting a municipality to liability for the actions of public servants. In defining the parameters of appropriateness, our starting point again must be Bivens. There, the Court permitted a remedy against federal agents who, by their own actions, violated the Constitution. See Bivens, supra, 403 U.S. at 397, 91 S.Ct. 1999.[32] The clear intendment of Bivens is that those directly responsible for unconstitutional behavior may be called to task for their wrongful acts.
 
 
 45
 It is no longer open to debate that, if the municipality is a proper party on which to impose liability, damages are an appropriate remedy for the alleged illegal arrest of Turpin. See Bivens, supra, 403 U.S. at 395, 91 S.Ct. 1999 at 2004. "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." Id. Turpin alleges a violation of rights protected by the fourth amendment that is made enforceable against the states through the due process clause of the fourteenth amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). As such, Turpin's claim stands on a common constitutional footing with the claim pressed in Bivens.[33]
 
 
 46
 The concept that a municipality itself, as well as its employees, can violate the strictures of the fourteenth amendment, is a meaningful one.[34] While a municipality, of course, can only act through its agents, Adekalu v. New York City, 431 F.Supp. 812, 819 (S.D.N.Y.1977), the actions and policy determinations of those in "high office" must be treated as the conduct of the governmental entity.[35] Accordingly, we hold that a damage action can be maintained against a municipality to redress injuries resulting from those actions of its employees that have been authorized, sanctioned or ratified by municipal officials or bodies functioning at a policy-making level.[36] Under such circumstances, it is clear that the municipality, no less than the employee, has violated the Constitution.[37]
 
 
 47
 While a federal remedy already exists, in most instances, against the employee under § 1983, the municipality cannot presently be made accountable for its Own wrongful acts. It seems a most elementary principle of logic that two remedies should be provided for two, distinct, constitutional wrongs. The force of this syllogism is magnified by the enhanced possibility of injury resulting from wrongful acts authorized or sanctioned by a municipality. The Court in Bivens noted that an agent acting in the name of the United States is possessed of vastly greater power than an individual trespasser acting in his own name. Certainly, the resources of an entire city, when directed and channelled by those in positions of authority, are far more potent than the force of a single, low-level employee.
 
 
 48
 Policy considerations suggest the appropriateness of the course we have taken. A municipality is ordinarily not judgment-proof, and may provide the only source of recovery for an individual injured by a violation of his constitutional rights. Moreover, a municipality is well-suited to spread the cost of compensating victims of tortious governmental behavior, and is arguably in the best position to reduce the incidence of such behavior by promulgating corrective policies. See G. Calabresi, The Cost of Accidents (1970). At the same time, by permitting liability only in those instances where the municipality is directly responsible for the unconstitutional behavior, the drain on the local fisc will be minimized. In a circuit whose contours include the City of New York, we are not insensitive to the financial plight of local governmental bodies.[38] In short, while allowing recovery for unconstitutional behavior on the part of the municipality is fair and reasonable, we should not needlessly expand recovery at the expense of already overburdened taxpayers.
 
 
 49
 To further safeguard local finances, some have suggested that a specialized form of immunity be granted municipalities faced with actions of such extraordinary dimensions as to significantly threaten municipal treasuries. See Damage Remedies, supra, 89 Harv.L.Rev. at 958. Obviously, we are not presented with facts raising this problem, and therefore decline to express our view as to the circumstances, if any, under which such immunity might be appropriate. Similarly, the question whether the immunity accorded officers in the "good faith" exercise of their duties, See, e.g., Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), should be extended to municipalities is also not presented by the instant facts.[39] Turpin's suit is premised on the contention that the Board of Police Commissioners knowingly encouraged members of the department to violate Turpin's civil rights.
 
 
 50
 In any event, we decline Turpin's invitation to impose liability on the City under a theory of Respondeat superior. Admittedly, some courts have concluded that a municipality should be liable for any constitutional violation committed by an employee in the course of his employment, even if not sanctioned by a policy-making entity. See, e.g., Santiago v. City of Philadelphia, 435 F.Supp. 136 (E.D.Pa.1977); Williams v. Brown, 398 F.Supp. 155 (N.D.Ill.1975). Such a determination, we believe, is fundamentally inconsistent with the import of Bivens. To the extent that one allows recovery under a theory of Respondeat superior, an additional remedy is being created for a single constitutional infraction. It is not a case of redress for two distinct constitutional violations.
 
 
 51
 This proposition is well illustrated by Dean Prosser's painfully clear description of the nature of derivative liability. An individual can be held liable for another's negligence even though he "has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it. . . . The foundation of the action is still negligence, or other fault, on the part of (the Primary actor); and all that the law has done is to broaden the liability for that fault by imposing it Upon an additional, albeit innocent, defendant." W. Prosser, Handbook of the Law of Torts 458 (4th Ed. 1971) (emphasis added). Since the Sine qua non of Bivens is the imposition of liability upon those actors who can meaningfully be termed "culpable," it is inappropriate to permit a recovery of damages from those who, by any standard, are innocent of wrongdoing. Courts should only create a cause of action where none exists or the need for one is demonstrated. We cannot, accordingly, ignore the fact that Congress has provided a primary remedy under § 1983 against the employees themselves, and has chosen not to impose vicarious liability upon the municipality.
 
 
 52
 Moreover, other factors counsel against our extension of the remedies already provided by Congress. There are, to be sure, lingering doubts about our power to impose vicarious liability upon municipalities. Cf. Monroe v. Pape, 365 U.S. 167, 191, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).[40] And, as we noted earlier, a drastic extension of existing law might well lead to serious drains upon municipal treasuries. The incorporeal spectre which so troubled many members of the House during the debates on the Sherman Amendment would take on substance, particularly in light of the increased involvement by local government in the daily affairs of its citizens. These concerns have led most courts to reject the concept of implied vicarious liability. Owen v. City of Independence, 560 F.2d 925 (8th Cir. 1977); Jamison v. McCurrie, 565 F.2d 483 (7th Cir. 1977); Adekalu v. New York City, 431 F.Supp. 812 (S.D.N.Y.1977); McDonald v. State of Illinois, 557 F.2d 596 (7th Cir.), Cert. denied, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (1977). Cf. Kostka v. Hogg, 560 F.2d 37 (1st Cir. 1977).
 
 
 53
 In rejecting Respondeat superior, we have created a harmonious legislative and judicial scheme for the enforcement of the fourteenth amendment, and thereby adhere to the teaching of Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), that implied remedies must, in nature and scope, be "consistent" with the legislative enactments already governing an area.
 
 
 54
 It is clear that notions of Respondeat superior have not been incorporated into § 1983 to permit the imposition of liability in damages upon supervisory personnel for the wrongs of their subordinates: "The rule in this Circuit is that when monetary damages are sought under § 1983, the general doctrine of Respondeat superior does not suffice and a showing of some personal responsibility of the defendant is required." Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir. 1973). Of course, since a municipality, the true employer for purposes of vicarious liability, cannot be made a defendant under § 1983, the failure to permit damage actions against supervisory workers does not constitute an appropriate test of Congress's views on the adoption of notions of Respondeat superior.
 
 
 55
 In contrast, however, an injunctive action under § 1983 against supervisory personnel is, in a very real sense, a suit against the municipality itself. See Monell v. Dep't of Social Services, 532 F.2d 259, 265 (2d Cir. 1976), Cert. granted, 429 U.S. 1071, 97 S.Ct. 807, 50 L.Ed.2d 789 (1977). As such, the disposition of this type of action, typified by the facts of Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), provides guidance in the cognate circumstances before us. In Rizzo, residents of the Philadelphia community alleged that various members of the City's police force had committed unconstitutional acts in the course of fulfilling their duties. Under § 1983, they sought broad injunctive relief against various city officials, including the institution of a mechanism for the disciplining of police officers. The plaintiffs, however, did not demonstrate that the random actions of the police officers were part of a concerted plan or pursuant to any departmental policy express or otherwise. This failure to prove any 'causal link' between individual incidents and the behavior of those in authority was fatal to their claim. In permitting municipal liability only where the governmental entity authorizes, sanctions, or ratifies the actions of its employees, we are creating a judicial remedy in concert with the standards applied to actions under § 1983.
 
 VI.
 
 56
 In applying the rule we have today articulated, we are mindful of the precept that a claim, especially one implicating civil rights, "should not be dismissed at the pleadings stage unless it appears to a certainty that plaintiffs are entitled to no relief under any state of the facts." Escalera v. New York City Housing Authority, 425 F.2d 853, 857 (2d Cir. 1970).[41] When so viewed, we find the allegations in Turpin's complaint sufficient to state a cause of action. His claim is premised, not on a set of random circumstances, as was the case in Rizzo, but rather on concerted behavior by the supervisory body of the West Haven Police Department. In essence, Turpin alleges that the Board of Police Commissioners, aware that the growing animus towards Turpin presented a threat to his liberties, acted in such a way as to encourage the expression of these feelings of hostility against him. Not only did the department fail to take any disciplinary action against Skeens, it rewarded him with a promotion.
 
 
 57
 We see little to be gained from arguing whether the Board's meeting to discuss possible disciplinary sanctions against Skeens constituted affirmative action as opposed to inaction. Where the actions of subordinate employees are concerted, the failure of supervisors to control their behavior may, in effect, create a De facto departmental policy. See, e.g., Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1969); Lewis v. Kugler, 446 F.2d 1343 (3d Cir. 1971). In the context of this case, it would not be impossible to conclude that the West Haven Police Department had an "implicit policy" of encouraging harassment of Turpin. But, we do not pass on the merits of this case. We are merely dealing with words in a complaint and whether its allegations are sufficient to permit the action to go forward.
 
 
 58
 We accordingly remand for further proceedings consistent with the views expressed herein. Given our disposition of Turpin's right of action under the fourteenth amendment, a reconsideration of the dismissal of his pendent state claims is warranted. We leave that task to the discretion of the district judge. See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 VII.
 
 59
 In sum, therefore, we have today decided that a municipality can be liable in damages for the unconstitutional actions of its employees. Recognizing, however, that remedies should be implied only against those who have themselves contravened the strictures of the fourteenth amendment, we limit the action to those instances in which the municipality is itself a wrongdoer. This governmental culpability arises whenever the unconstitutional actions of employees are authorized, sanctioned, or ratified by municipal officials or bodies functioning at a policy-making level. We expressly decline to impose liability on a municipality, under a theory of Respondeat superior, for each and every wrongful act undertaken by its workers. Accordingly, while we have woven an important thread, heretofore missing, into the fabric of fourteenth amendment protections, we have done so cognizant of the traditional prerogatives of Congress, and of our responsibility to give substance to the Constitution. In performing this task, we have not been unmindful or insensitive to the increasing pressures daily being imposed upon municipalities.
 
 OAKES, Circuit Judge (concurring):
 
 60
 The parade of horribles envisaged by the dissent prompts me to write this brief concurrence which in no respect qualifies my concurrence in Chief Judge Kaufman's fine majority opinion.
 
 
 61
 That parade, consisting of unlimited municipal liability for the countless unconstitutional acts committed across the land by municipalities' policymaking bodies assumes a state of lawlessness and disregard of constitutional rules that is reminiscent of the early days of Tombstone, Arizona. This assumption is unfair to the municipalities as well as to their officials. The parade demonstrates an unawareness, if not an open disregard, of insurance, a fundamental institution in American commerce designed to spread risk. It also overlooks the abolition of municipal immunity for torts which has taken place in some forty states over the last two or three decades, both by statute and by court decision.[1] Why it is permissible for municipalities to be responsible for nonconstitutional torts, say an automobile death caused by a city truck operator driving negligently, but it is "staggering" if they are not immune from supposed "incalculable liability" for the deprivation of fundamental personal rights protected by the Fourteenth Amendment[2] is a little difficult for me to follow.
 
 
 62
 The dissent's broadbased frontal attack premised on excerpts from sources as diverse and conflicting as Eugene Rostow and Raoul Berger[3] on what it perceives as "judicial activism" is better answered in the pages of a law review than in the context of a judicial opinion. Still it seems worthwhile to call attention to the wisdom of Mr. Justice Cardozo, no flaming activist:
 
 
 63
 The great ideals of liberty and equality are preserved against the assaults of opportunism, the expediency of the passing hour, the erosion of small encroachments, the scorn and derision of those who have no patience with general principles, by enshrining them in constitutions, and consecrating to the task of their protection a body of defenders.[4]
 
 
 64
 He also counseled that "the power to declare the law carries with it the power, and within limits the duty, to make law when none exists . . . ."[5] Since it is a novel question whether the Fourteenth Amendment permits a direct action against municipalities for their unconstitutional acts, "we are not fettered by an inveterate course of decisions upon it. We are at liberty . . . to decide it upon reason and not by precedent." Conner v. Long, 104 U.S. 228, 243, 26 L.Ed. 723 (1881) (Matthews, J.).
 
 
 65
 With these guiding principles in mind, I turn to several technical points which illustrate that the dissent's historical and legal analysis is somewhat askew. (1) Fisher v. City of New York, 312 F.2d 890 (2d Cir.), Cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963), quoted in the lead paragraph of the dissenting opinion, was decided eight years before Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), recognized a direct right of action under the Bill of Rights for at least Fourth Amendment violations. The Second Circuit panel deciding Fisher thus did not have the benefit of the Bivens analysis, much less that of the many commentaries and decisions on Bivens -type questions. To point to Fisher is, therefore, a little disingenuous, to say the least.
 
 
 66
 (2) The dissent fails adequately to treat the limitations built into the right to damages against municipalities. One commentator has pointed out that not only must the interest to be remedied be (a) "protected by the Constitution" and (b) "produced by 'state action' within the meaning of the fourteenth amendment" but (c) the action must also be the "sort of abuse of government power that is necessary to raise an ordinary tort by a government agent to the stature of a violation of the Constitution." Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922, 952 (1976) (hereinafter Note, Damage Remedies ). This third criterion, which has been set out in Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), Jones v. Marshall, 528 F.2d 132, 137-39 (2d Cir. 1975) (use of deadly force against escaping felon not a deprivation of a constitutional right), and Johnson v. Glick, 481 F.2d 1028, 1032-33 (2d Cir.), Cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (correctional officers' conduct must shock the conscience), eliminates both de minimis cases and even some substantial cases such as, for example, those for a first false arrest. See also Meredith v. Arizona, 523 F.2d 481, 483 (9th Cir. 1975). Another limiting factor is the jurisdictional amount of $10,000 in 28 U.S.C. § 1331[6] which probably precludes cases involving many deprivations of free speech, free assembly and Fourth Amendment rights. See, Note, Damage Remedies, supra at 960 n.189. And the Supreme Court's recent opinion, Carey v. Piphus, --- U.S. ----, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), requiring compensable loss over and above constitutional deprivation, is a major limitation. Other limitations may arise or will occur to the reader. That they are not recognized in the dissenting opinion is unfortunate.
 
 
 67
 (3) The dissent's reliance upon the speeches of Congressmen Bingham and Stevens in introducing the proposed Fourteenth Amendment to the House of Representatives is totally misplaced. Bingham's original bill became the fifth section of the Amendment. But, as finally adopted, the Amendment contained five sections, the first four of which the dissent would evidently prefer to ignore. Of course the draftsmen of the Fourteenth Amendment "intended to give Congress the power to enforce its provisions," as the dissent states. Post at 175. But since Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 510 (1913), it is well established that the other sections of the Amendment have their own efficacy, irrespective of Congressional enactment: they act as a shield against past local acts of unconstitutionality as well as a sword against future local acts of unconstitutionality.[7] A more complete reading of one source cited by the dissent, B. Schwartz, 1 Statutory History of the United States: Civil Rights, covering pages 184-333, and especially pages 272-73 and 306 (1970), will prove beyond refutation that more was intended by the Framers of the Fourteenth Amendment than merely enabling Congress to make laws carrying it into effect. See also C. Fairman, 6 History of the Supreme Court of the United States 1270-1300 (1971).
 
 
 68
 (4) So too with Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1879). That case obviously has validity for the proposition that the reach of Congress's power under Section 5 of the Fourteenth Amendment is substantial, as explicated in Fitzpatrick v. Bitzer, 427 U.S. 445, 453-56, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). It has, however, not had since Brown v. Board of Education, supra, or for that matter Harper v. Virginia Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), any validity for the proposition that the Amendment can be enforced Only if Congress acts. That is the Ex parte Virginia proposition which the dissent would advance. Ex parte Virginia, supra, may be alive and well in the dissent's eye, but its dictum quoted by the dissent, Post at 175, is dead and, hopefully, buried. Of course, this presupposes that Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), overruled in Gayle v. Browder, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956) (per curiam), is also no longer good law.
 
 
 69
 (5) Professor Tribe's treatise is referred to by the dissent. At footnote 16 the dissent quotes his reference to certain critics of the doctrine of judicial review. Professor Tribe's analysis of the criticism should be noted as well:
 
 
 70
 Initially, the critics may be evaluated in their own terms. Their arguments rest ultimately upon a dichotomy between a democratic political process and an antidemocratic adjudicatory process. It is this dichotomy which creates the problem of legitimacy for judicial review, and it is this dichotomy which the critics seek to bridge. A realistic analysis of judicial and political institutions, however, might suggest that the dichotomy is more metaphorical than real. Certainly, the Constitution does provide for an independent judiciary, by granting article III judges a fixed salary and life tenure, and by making congressional removal, at least, quite difficult. The process of appointment, however, is entirely political, and the sometimes quite rapid turnover in the Supreme Court's membership suggests that the federal judiciary may be more capable of adapting to changes in the political consensus than the notion of an independent judiciary would immediately suggest. Moreover, it is not ultimately true that constitutional decisions are beyond the reach of democratic politics: there is, after all, the process of constitutional amendment, a process which is again almost purely political, and which has in fact been used successfully on four occasions to override Supreme Court decisions. More fundamentally if less dramatically, the Court's power to move beyond a current consensus is circumscribed by its institutional incapacity to lead where others are too reluctant to follow. If judicial review thus may be somewhat more democratic than its stereotype, it may also be true that the democracy of legislative and executive politics is overstated. The point does not require much development: the ways in which representative democracy in practice diverges from the ideal are well-known. The result then is an imperfectly antidemocratic judicial process and an imperfectly democratic political process; the conclusion which this result suggests is that, Contra the critics, it cannot be consent which is the sole touchstone of legitimacy.
 
 
 71
 L. Tribe, American Constitutional Law 49-51 (1978) (footnotes omitted).[8]
 
 
 72
 (6) One further point, though others could be made; the dissent emphasizes that "(j)udges should consider the economic and social consequences of their decisions and should gauge the wisdom of their acts by the results which are likely to ensue." Post at 182. I agree wholeheartedly. Of course, by this the dissent admits that value judgments do ultimately, and especially in hard cases,[9] play a role, even in constitutional adjudication. I wonder how that admission squares with the dissent's purported eschewing of "judicial activism," "judicial legislation" and "judicial autocracy." In the end, it is the dissent's value judgment based upon "economic and social consequences" including "incalculable liability" that prompts the dissent to decide as it does. Different value judgments motivate the majority to decide a different way. I believe the dissent is entitled to its judgment without pejoratives. I regret that the dissent does not play by the same rules.
 
 
 73
 VAN GRAAFEILAND, Circuit Judge (with whom MULLIGAN, TIMBERS and MESKILL, Circuit Judges, concur), dissenting:
 
 
 74
 In Fisher v. City of New York, where plaintiff's complaint seeking money damages was dismissed, this Court said:
 
 
 75
 Insofar as plaintiff's claim is based, not on the Civil Rights Act, but directly upon Section 1 of the Fourteenth Amendment to the United States Constitution, we affirm on the ground that plaintiff has not stated a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.
 
 
 76
 312 F.2d 890, 891 (2d Cir.), Cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963).
 
 
 77
 Our Brothers in the majority have now arrived at a completely contrary holding. In doing so, they do not tell us whether Judges Medina, Waterman and Moore erred in deciding Fisher as they did or whether these able judges were simply interpreting a different Constitution from the "modern Constitution" which the majority herein purport to construe.
 
 
 78
 The majority justify their holding by stating that they are simply creating a "(structure) for enforcement similar to those normally fashioned by legislatures." They say that they are "(invigorating) the political process," that they are indulging in "judicial rule-making" which they liken to "legislative activity," and that they are thus opening a "dialogue with Congress."[1] With all due respect for our Brothers' good intentions, we do not believe that a decision of such incalculable impact as the one they now make can be justified as simply the opening of a "dialogue with Congress"[2] or that it comports with this Court's constitutional role in a democratic society.
 
 
 79
 * Commentators who advocate the judicial adoption of a "modern Constitution" tend to look with disdain upon the intentions of those who labored so hard to frame the written document. That standards of interpretation should be based upon these intentions is labeled as a "filiopietistic notion" completely out of place in what these advocates are convinced is a more enlightened age.[3] Judges are more circumspect. Rare indeed is the judge who will concede that his decision departs in the slightest from the meaning and intent of the carefully prepared text. The American public must be "mercifully soothed" into a belief that each judicial pronouncement, no matter how autocratic, is made in compliance with the people's constitutional mandate.[4] However, a court which pays only lip-service to a "continual insistence upon respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of federalism and separation of powers have played in establishing and preserving American freedoms,"[5] is derelict in fulfilling the obligations so carefully imposed upon it by the framers of our Constitution. Consistent with this belief, we deem it important to reexamine, even though briefly, the role that the federal judiciary was designed to play in our democratic society.[6]
 
 A.
 
 80
 Students of constitutional history are agreed that one of the primary factors which motivated the authors of our Constitution was the fear of unchecked power in the institutions which they created.[7] It is clear, moreover, that this apprehension was not directed against the legislative branch alone.[8] Unlimited judicial power was to be guarded against, and this meant, among other things, that the judiciary was to be precluded from participating in the legislative process.[9] "Judicis est jus dicere non dare"[10] was an established maxim of the English law which served as a guide and inspiration for the constitutional framers. Rufus King, one of the Constitutional delegates, stated "that the Judges ought to be able to expound the law as it should come before them, free from the bias of having participated in its formation."[11]
 
 
 81
 One may wonder how we have moved from the clearly documented position of the framers of the Constitution to the position taken by the majority herein, as illustrated in the above quoted passages from Chief Judge Kaufman's opinion. The answer is that, as a practical matter, the only restraint upon the power of the federal judiciary is that which is self-imposed.[12]
 
 
 82
 One need only skim through the all too numerous Supreme Court dissents to recognize that on occasion judicial activism has been checked with a very loose rein.[13] Sometimes this has pleased the so-called conservatives; at other times it has gratified the so-called liberals. During the early decades of the twentieth century, those who are today's staunchest supporters of judicial activism were the most vocal critics of the Supreme Court's "usurpation" of congressional powers in striking down social and welfare legislation.[14] When the focus of the judiciary swung from property rights to personal rights, a new and different set of critics came to the fore.[15] The issue, as these critics see it, is not one of liberalism versus conservatism, but one of representative democratic government versus judicial autocracy.[16]
 
 
 83
 It is obvious that the majority herein, in an attempt to avoid the charge that their decision is undemocratic, have opted, lock, stock and barrel, for the concept of a "constitutional common law" espoused by Professor Monaghan.[17] Professor Monaghan asserts that due process holdings may be either "pure" constitutional or "quasi"-constitutional in nature, or they may be broken down into pure and quasi-constitutional components. Pure constitutional holdings, he says, may be modified only by constitutional amendment. As to the quasi-constitutional holdings which he calls the "common law" of the Constitution, Congress is now to play the "checks and balances" role which the constitutional framers intended for the Supreme Court. As Professor Monaghan puts it, "(W)here the Court's rule is perceived to have gone too far, it can be rejected or modified by the political process without the necessity of a constitutional amendment."[18]
 
 
 84
 Unfortunately, calling the end product "constitutional common law" does not change the nature of the process by which it is reached. That, purely and simply, is judicial legislation, defined euphemistically by the majority as opening a "dialogue with Congress" or "invigorating the political process." "Invigoration" means that courts are to take the legislative initiative, with Congress following docilely behind, confronted after each judicial decision with the problem of deciding whether the court was legislating (constitutional common law) or judging (pure constitutional law). When the majority say that Congress is unlikely to negate its ruling in this case, they do more than "hazard a conjecture." If the lay members of Congress can determine what part of the majority's holding is "pure" constitutional law and what part is "constitutional common law," they are more perceptive than the writer of this opinion.[19]
 
 
 85
 In any event, the majority do not answer the charge of over-reaching by conceding that Congress may have the right to "reverse" its decision in whole or in part. The issue here is not whether any part of the majority's holding can be discarded by Congress; it is whether the American people, speaking through their Congress and their written Constitution, have authorized this Court to permit an award of damages against municipalities directly under the Fourteenth Amendment. We are satisfied that anyone who reads the history of this Amendment and of 42 U.S.C. § 1983 without "a preconceived determination to attain a particular constitutional goal"[20] will conclude that they have not.
 
 
 86
 In the seminal case of Monroe v. Pape, 365 U.S. 167, 180, 81 S.Ct. 473, 480, 5 L.Ed.2d 492 (1961), the Court, speaking of the Ku Klux Klan Act of April 20, 1871, now in part § 1983, said, "It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts . . . ." In Mitchum v. Foster, 407 U.S. 225, 239, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705 (1972), the Court said, "Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." In Lynch v. Household Finance Corp., 405 U.S. 538, 543, 92 S.Ct. 1113, 1117, 31 L.Ed.2d 424 (1972), the Court said, "In fact, the Congress that enacted the predecessor of §§ 1983 and 1343(3) seems clearly to have intended to provide a federal judicial forum for the redress of wrongful deprivations of property by persons acting under color of state law."[21] If these were correct statements of the law, and we conclude that they were, there was no federal right of action directly under the Fourteenth Amendment. The history of the enactment of the Fourteenth Amendment fully supports this conclusion.
 
 B.
 
 87
 This Amendment had its genesis in the Civil Rights Act of 1866, 14 Stat. 27, which was passed over President Johnson's veto on April 9th of that year. This Act provided that all citizens, regardless of color, shall have the same right "to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property . . . ." Violation of the Act by any "person" under color of law was made a misdemeanor, and federal courts were given jurisdiction of all causes, civil and criminal, arising out of the Act.
 
 
 88
 Fearful that the Act might be repealed by a subsequent Congress and in doubt as to its constitutionality, its supporters pushed actively for a constitutional amendment along similar lines.[22] In February 1866, Congressman Bingham, one of those who questioned the constitutionality of the Civil Rights Act of 1866, introduced a bill in the House proposing the following constitutional amendment:
 
 
 89
 The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property.[23]
 
 
 90
 Although this bill was not passed, its similarity to § 5 of the Amendment which was submitted to the States for ratification on June 13, 1866, is readily apparent.
 
 
 91
 Equally apparent were the intentions of the supporters of the proposed Amendment. Speaking on behalf of this original bill, Congressman Bingham said, "I have advocated here an amendment which would arm Congress with the power to compel obedience to the oath, and punish all violations by State officers of the bill of rights . . .."[24] Thereafter, Congressman Stevens, in introducing the proposed Amendment to the House, said, "(T)he Constitution limits only the action of Congress, and is not a limitation on the States. This amendment supplies that defect, and allows Congress to correct the unjust legislation of the States, so far that the law which operates upon one man shall operate Equally upon all."[25] Senator Howard, who introduced the proposed Amendment in the Senate, said of § 5, "It casts upon Congress the responsibility of seeing to it, for the future, that all the sections of the amendments are carried out in good faith, and that no State infringes the rights of persons or property. I look upon the clause as indispensable for the reason that it thus imposes upon Congress this power and this duty."[26] Public opinion, at least in the North, was that the Fourteenth Amendment "gave Congress the power to define and secure the privileges of citizens of the United States."[27]
 
 
 92
 Clearly, the draftsmen of the Fourteenth Amendment intended to give Congress the power to enforce its provisions. The Supreme Court acknowledged this to be so in Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880). Speaking of § 5 of the Fourteenth Amendment, the Court said:
 
 
 93
 All of the amendments derive much of their force from this latter provision. It is not said the Judicial power of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a State in violation of the prohibitions. It is the power of Congress which has been enlarged. Congress is authorized to Enforce the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective. Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission, to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.
 
 
 94
 Id. at 345-46 (emphasis in original).
 
 
 95
 Although the majority dismiss Ex parte Virginia out of hand as "resurrected" authority, eminent Supreme Court justices have treated it more kindly. Eighty-six years after Ex parte Virginia, Justice Black, dissenting in Harper v. Virginia Board of Elections, cited it with obvious approval and said:
 
 
 96
 Moreover, the people, in § 5 of the Fourteenth Amendment designated the governmental tribunal they wanted to provide additional rules to enforce the guarantees of that Amendment. The branch of Government they chose was not the Judicial Branch but the Legislative.
 
 
 97
 Thus § 5 of the Fourteenth Amendment in accordance with our constitutional structure of government authorized the Congress to pass definitive legislation to protect Fourteenth Amendment rights which it has done many times, E.g., 42 U.S.C. § 1971(a). For Congress to do this fits in precisely with the division of powers originally entrusted to the three branches of government Executive, Legislative and Judicial.
 
 
 98
 383 U.S. 663, 678-80, 86 S.Ct. 1079, 1088, 16 L.Ed.2d 169 (1966).
 
 
 99
 In 1966, Justice Brennan, speaking for the Court in Katzenbach v. Morgan, also cited Ex parte Virginia with approval and said:
 
 
 100
 A construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment.
 
 
 101
 384 U.S. 641, 648, 86 S.Ct. 1717, 1722, 16 L.Ed.2d 828 (1966) (footnote omitted).
 
 
 102
 Four years later, in Oregon v. Mitchell, Justice Douglas added:
 
 
 103
 Equal protection became a standard for state action and Congress was given authority to "enforce" it. See Katzenbach v. Morgan, 384 U.S. 641, 647, (86 S.Ct. 1717, 16 L.Ed.2d 828). The manner of enforcement involves discretion; but that discretion is largely entrusted to the Congress not to the courts.
 
 
 104
 400 U.S. 112, 135, 143, 91 S.Ct. 260, 274, 27 L.Ed.2d 272 (1970) (separate opinion).
 
 
 105
 As recently as 1976, Justice Rehnquist, writing for the Court in Fitzpatrick v. Bitzer, spoke of Ex parte Virginia in the following language:
 
 
 106
 The impact of the Fourteenth Amendment upon the relationship between the Federal Government and the States, and the reach of congressional power under § 5, were examined at length by this Court in Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676 (1880).
 
 
 107
 427 U.S. 445, 453, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976). The Court further stated:
 
 
 108
 In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment . . . .
 
 
 109
 Id. at 456, 96 S.Ct. at 2671.
 
 
 110
 If the foregoing quotations have any meaning, Ex parte Virginia has not been "resurrected" by appellee; Ex parte Virginia has never been dead.
 
 
 111
 We are not met in this case with the interesting question of whether this Court might create municipal liability if Congress had not already acted. Congress has acted.[28] It promulgated the Ku Klux Klan Act of 1871, whose "primary purpose" was to enforce the provisions of the Fourteenth Amendment,[29] and in that Act it excluded municipalities from liability.[30] Although Congress may have been mistaken in believing that it was without power to make municipalities liable for the unlawful acts of its agents, "we must construe the statute in light of the impressions under which Congress did in fact act . . . ."[31] We are concerned with the intent of Congress, not with its motive. Moreover, there has been no indication that Congress has changed its mind.
 
 
 112
 The majority opinion notes that Congress had failed to overrule Monroe v. Pape, supra, in the sixteen years since that case was decided. Yet, reasoning that congressional silence is a poor indicator of congressional intent, the majority decline to "find guidance in congressional inaction." One may well ask how this squares with the majority's earlier statement that they wish to conduct a "dialogue" with Congress. One may also ponder how it is that a court which is prepared to equate inaction upon the part of police officials with a "De facto departmental policy" can find no guidance whatever in congressional inaction.
 
 
 113
 There are several indications that Congress is not displeased with Monroe v. Pape. Although bills to overrule it have been introduced repeatedly since 1962,[32] the only one even to reach the hearing stage was S. 35.[33] Testimony on S. 35 was heard on February 8 and 9 of this year, and additional hearings have been scheduled.[34]
 
 
 114
 The failure of Congress to take action on any of the bills cannot be explained by congressional failure to give attention to the subject of civil rights. Since Monroe v. Pape, Congress has passed at least seven acts which deal in whole or in part with civil rights.[35] Significant among these statutes is Title VII of the Civil Rights Act of 1964.[36] In setting up a system of administrative remedies for individuals discriminated against by any "person" in employment, § 701(a) of the Act defined "person" to include individuals, labor unions, partnerships, etc. In 1969, the United States Civil Rights Commission issued a report which found that state and local governments were not providing equal job opportunities and recommended that § 701(a) be amended to include them within the definition of "person."[37] The Equal Employment Opportunity Act of 1972 incorporated the Commission's recommendation. The definition of "person" in § 701(a) was amended by § 2 of the 1972 Act to include "governments, governmental agencies (and) political subdivisions."[38]
 
 
 115
 Clearly, Congress knows how to amend the definition of "person" to include municipalities. Its failure to do so with § 1983 takes on added significance when it is recognized that just such a change was recommended by the United States Civil Rights Commission in 1961, 1963 and 1965.[39]
 
 
 116
 These post-Monroe developments in the legislative branch are strong indications that Congress does not favor municipal liability. If there is to be any meaning at all in the concept of a "dialogue" between the courts and Congress, it must come from the courts being as willing to listen to Congress as to have Congress listen to them. In this case, Congress can be plainly heard.
 
 C.
 
 117
 The majority seek to support their position with the Supreme Court's holding in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, in his opinion for the Court, Justice Brennan quite carefully pointed out that "we have here no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents . . . ."[40] In the instant case, we do have a specific congressional declaration that recovery may be had against "persons" and a clear congressional intent that "persons" does not include "municipalities."[41] Because of that fact, Aldinger v. Howard, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), is more pertinent authority. In Aldinger, the plaintiff, who had been discharged without a hearing from her job as a county clerical worker, brought suit against certain county officers as well as the county itself. Plaintiff alleged a violation of § 1983 in that her discharge violated her rights under the First, Ninth and Fourteenth Amendments. In addition, she asserted a claim against the county under state law for the tortious conduct of its officials. She contended that the district court was empowered to hear the state law claim under the doctrine of either pendent or ancillary jurisdiction. In rejecting this claim, the Court said:
 
 
 118
 But the question whether jurisdiction over the instant lawsuit extends not only to a related state-law claim, but to the defendant against whom that claim is made, turns initially, not on the general contours of the language in Art. III, I. e., "Cases . . . arising under," but upon the deductions which may be drawn from congressional statutes as to whether Congress wanted to grant this sort of jurisdiction to federal courts. Parties such as counties, whom Congress Excluded from liability in § 1983, and therefore by reference in the grant of jurisdiction under § 1343(3), can argue with a great deal of force that the scope of that "civil action" over which the district courts have been given statutory jurisdiction should not be so broadly read as to bring them Back within that power merely because the facts also give rise to an ordinary civil action against them under state law. In short, as against a plaintiff's claim of Additional power over a "pendent party," the reach of the statute conferring jurisdiction should be construed in light of the scope of the cause of action as to which federal judicial power Has been extended by Congress.
 
 
 119
 Id. at 16-17, 96 S.Ct. at 2421 (emphasis in original).
 
 
 120
 Although the question of § 1331 jurisdiction was not considered by the Aldinger Court,[42] we believe the same reasoning should apply in this case. Municipalities which Congress Excluded from liability in § 1983 should not be brought Back into the liability fold under § 1331 simply by adding to the complaint an allegation that the amount in controversy exceeds $10,000.
 
 
 121
 In sum, then, we believe that a cause of action for damages is not inherent in the provisions of the Fourteenth Amendment. The responsibility for implementing these provisions was delegated expressly to Congress. Congress has accepted this responsibility and created a comprehensive legislative scheme for the protection of the civil rights of the citizenry. Although this scheme has been subjected to constant searching scrutiny, Congress has never seen fit to bring municipalities within its scope. This Court should not usurp that legislative prerogative.
 
 II
 
 122
 Despite the arguments advanced above, the fact remains that the five judges constituting the majority herein have the power to expose every city, town and hamlet in the Second Circuit to incalculable liability under the Fourteenth Amendment, subject only to being overruled by the United States Supreme Court.[43] We have stated why we think the exercise of that power is improper. We now suggest a number of reasons why we think it is unwise.
 
 
 123
 The choice of remedial relief should not be exercised in a factual vacuum. Before we set out on the laudable pursuit of justice, we should have some notion of where we are going. "There can be no wisdom in the choice of a path unless we know where it will lead."[44] From the earliest days of our country, men of wisdom have expressed concern over the power of the judiciary to impose financial burdens upon state and local governments.[45] This concern was one of the main reasons for the enactment of the Eleventh Amendment.[46] Moreover, the proposed Sherman Amendment to § 1983, which would have allowed recovery against municipalities, was rejected in large part because of the devastating effect these damages might have on municipalities.[47] In recent years, the Supreme Court has expressed increasing concern about the effect of lower court decisions on the financial stability of communities and the consequent impairment of their ability to render essential governmental services.[48]
 
 
 124
 As Justice Blackmun did in City of Lafayette v. Louisiana Power & Light Co., we "question the nonchalance with which the Court puts aside the question of remedy."[49] The majority state in one breath that they recognize the "financial plight of local governmental bodies"[50] and in another that municipalities are "well-suited to spread the cost of compensating the victims of tortious governmental behavior." Our Brothers simply cannot have it both ways.[51]
 
 
 125
 There is a substantial distinction between Bivens and the present case, which they do not discuss, and that is the vast difference in the scope of the causes of action under consideration. Bivens permitted recovery against federal officers who violated the Fourth Amendment; the majority allow recovery against municipalities for Fourteenth Amendment violations. The Fourteenth Amendment incorporates or absorbs most of the provisions of the Bill of Rights. Its due process clause makes applicable to communities all of the provisions of the first eight amendments except Two, Three, and Seven, the indictment clause of Five and the excessive bail clause of Eight.[52] As interpreted by the Supreme Court, the Fourteenth Amendment may be violated by conduct which offends "traditional notions of fair play and substantial justice,"[53] which "shocks the conscience,"[54] or which conflicts with "deeply rooted feelings of the community."[55] Future interpretations of the Fourteenth Amendment can only be the subject of conjecture.[56] Due process is an open-ended, indefinite concept which defies precise definition.[57] The Constitution is said to have been drawn "with purposed vagueness so as to leave room for the unfolding future."[58] Dissents evolve into majority holdings,[59] and Stare decisis in this area is a concept of limited application.[60]
 
 
 126
 The equal protection clause blends into the due process clause because they both stem from the concept of fundamental fairness.[61] It too sets standards of conduct somewhat less definitive than the 55 miles per hour speed limit.[62] The differences within the Supreme Court concerning discrimination based upon wealth indicate a direction in which future litigation over equal protection may be heading.[63] We have said that case by case inquiry is required for a determination as to whether equal protection standards have been met,[64] and this procedure may be satisfactory when the judicial answer is a simple "Aye" or "Nay". However, if the "Nay" is to be accompanied by a verdict for substantial damages, it is possible that the concept of fundamental fairness will become somewhat lopsided in its application. Municipal officials cannot go, hat in hand, to the nearest federal judge to secure a ruling in advance as to the constitutionality of every proposed ordinance or the proper school in which to place every minority student. They can secure such a ruling only after they have been sued.[65]
 
 
 127
 During the year ending June 30, 1977, more than 13,000 civil rights cases were filed in the United States District Courts.[66] This is 8,000 more than were filed in 1971 and represents about ten per cent of the entire volume of civil suits commenced.[67] In this Court, fourteen per cent of all civil appeals during the 1976-77 year were civil rights cases.[68] According to a survey by Americans for Effective Law Enforcement, civil rights suits against police officers have increased from 2,000 in 1971 to over 6,000 in 1977.[69] Because, as the majority construe the law, the failure of supervisors to control police behavior may create a "De facto departmental policy," it blinks reality to assume that municipalities will not be included as parties defendant in most actions of this type. As the district court observed in this case, there are approximately 30 law suits pending in the District of Connecticut alone in which claims similar to the present one have been brought against municipalities.
 
 
 128
 More important, perhaps, than any of the foregoing is the likelihood of a marked increase in societal litigation under the class action provisions of the Federal Rules of Civil Procedure, with staggering amounts at stake in each case.[70] It has been suggested that the Constitution may not require judges to undertake the "vast redistribution of wealth" which could result from litigation of this sort, and that some form of limited immunity should be developed.[71] The majority, however, tiptoe around this problem by declining to express their view as to the circumstances, if any, under which such immunity might be appropriate. Perhaps they deem this determination to be part of the mopping-up-after-the-Second-Circuit role that Congress will be forced to play in the legislative "dialogue" which they have commenced.
 
 
 129
 Judges should consider the economic and social consequences of their decisions and should gauge the wisdom of their acts by the results which are likely to ensue.[72] There is, we think, a painful likelihood that our Brothers' decision will act as a catalyst in the exacerbation of social friction, of which, unfortunately, there is already too much in this great Country. Should this come to pass, it will benefit neither the courts nor the Country.[73]
 
 
 130
 The majority also avoid the question whether a "good faith" defense will be available to the communities located in New York, Connecticut and Vermont. Government officers and employees sued under § 1983 are entitled to either absolute or qualified immunity. Absolute immunity has been accorded to judges,[74] legislators,[75] and prosecutors.[76] Qualified immunity is available to other governmental employees in the form of a "good faith" defense against liability. Briefly stated, a municipal or state employee is not liable in damages for constitutionally prohibited conduct if he acted with a reasonable, good faith belief that he was not violating the plaintiff's constitutional rights.[77] The consensus among the circuits appears to be, however, that a municipality is not entitled to the defense of "good faith."[78]
 
 
 131
 This is a matter to which the majority should speak. Although our Brothers carefully refrain from outlining the entire picture they have only begun to paint, they must complete at the least that portion of the canvas which is directly before them. They say that the plaintiff's suit is premised on the contention that the Board of Police Commissioners knowingly encouraged members of the department to violate plaintiff's civil rights and that, therefore, the question of municipal immunity is not an issue in the case. We disagree. The majority assume that the Police Board is the City. It is perhaps more accurate to say that the mayor and the common council are the City. The Police Board may be operating at a "policy-making" level and yet be formulating policies which are contrary to the intentions of the City fathers. If this proves to be so, the question of municipal good faith will be squarely in the case. If the majority intend to impose no-fault constitutional liability upon West Haven for erroneous policy-making decisions of its officials, they should say so. The people who live in the Second Circuit are entitled to know where this Court is taking them, even if there is nothing they can do about it.
 
 
 132
 The majority should also make clear whether they intend their "modern" constitutional rule to apply to legislative as well as executive officers, so that our communities will know whether they are to be held financially liable for the enactment of ordinances which prove to be unconstitutional. In the field of constitutional law, consensus in interpretation is not the judicial norm.[79] This case, with its five-four split among the judges, is no exception. If the Supreme Court accepts review and reverses, the majority will suffer only an injury to their pride.[80] The majority should tell us whether a similar error in judgment by the community fathers in some hamlet in upstate New York or in the hills of Vermont will subject their community to liability in damages. These communities should know that if they enact an ordinance which subsequently is declared to be unconstitutional, this Court's present holding may require them to respond in damages.[81]
 
 
 133
 Unlike Bivens, this case does not deal with individual defendants but with units of government created by the state. They are entrusted and charged with the primary responsibility of delivering basic support services to their residents.[82] Federal intervention which impairs their ability to render such services raises questions of comity and federalism which were not before the Court in Bivens.[83] If intervention is to come from the federal government, it should come from Congress, not the courts.[84] This is especially true where the question of intervention is under active consideration by the legislative branch. Congress is better equipped to determine the "complex factual questions of the kind so often involved in constitutional adjudication."[85] For example, Congress has already had the benefit of the thinking of the Attorneys General of all 50 states who have voiced their unanimous opposition to S. 35, on which Congress is now holding hearings. Conceding, for the argument, that our Brothers are able to make wise decisions without inputs of this nature, the fact remains that Congress is the elected voice of the people and "presumptively has popular authority for the value judgment it makes."[86]
 
 
 134
 We are not prepared to accept the argument of those who say that "the democracy of legislative and executive politics is overstated" and that an "imperfectly antidemocratic judicial process" is therefore justified in taking over for an "imperfectly democratic political process."[87] We leave to historians the question whether "usurpation" of legislative processes by the judiciary has contributed to any imperfections which may exist in the federal democratic process. However, we need not wait for the voice of history to turn us from excessive interference by the federal judiciary in the affairs of community government, where the democratic ideal retains its greatest vitality.
 
 
 135
 We have been forceful and comprehensive in our comments because we do not believe that the residents of the Second Circuit should be "mercifully soothed" into the belief that the majority's decision concerns merely a minor incident involving a West Haven police officer. Insofar as municipal liability for Fourteenth Amendment violations is concerned, this case is the crossing of the Rubicon. Once this Court has exposed municipalities to liability, it strains credulity to believe that it will discontinue its invigoration of the political process and confine future decisions to the narrow factual and legal situation here presented.[88] Today's decision must be viewed in the light of what it portends for tomorrow's.
 
 
 136
 We bring this dissent to a close with two quotations, one from a great American jurist and one from a black school principal in Cleveland, Ohio. We quote them together, because in their own way they are each saying the same thing. Dissenting in Baldwin v. Missouri, Justice Holmes said:
 
 
 137
 I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable. I cannot believe that the Amendment was intended to give us Carte blanche to embody our economic or moral beliefs in its prohibitions.
 
 
 138
 281 U.S. 586, 595, 50 S.Ct. 436, 439, 74 L.Ed. 1056 (1930).
 
 
 139
 In explaining why the citizens of Cleveland voted against an increase in school taxes, the principal said:[89]
 
 
 140
 There was the busing issue, a feeling of getting back at the judge, and also the frustration of having no part in making judgments that affect our lives. It is just a gut feeling, that people need to have a say in their lives.
 
 
 141
 We would affirm.
 
 
 
 [1]
 Our discussion of the factual background derives, in part, from Judge Newman's unreported decision in Turpin v. Skeens, Civil No. 15,428 (D.Conn., filed Feb. 20, 1975.)
 
 
 [2]
 Conn.Gen.Stat. § 7-465 requires a municipality to pay "all sums which (an) employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights". Turpin contends that the provision effectively allows a suit against the City under a theory of Respondeat superior
 
 
 [3]
 Since Turpin's claim is not wholly frivolous, we clearly have jurisdiction under 28 U.S.C. § 1331 to determine whether he has stated a valid cause of action. See Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)
 
 
 [4]
 Many have questioned Monroe's analysis of § 1983's legislative history insofar as it purports to describe Congress's attitude toward various forms of municipal liability. See, e.g., Comment, 57 Calif.L.Rev. 1142, 1164-70 (1969); Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922, 945-51 (1976) (hereinafter cited as Damage Remedies )
 
 
 [5]
 The scope of § 1983 has been limited in a variety of other ways. For example, supervisory officials cannot be sued without a showing that their behavior played a role in the malfeasance of their subordinates, See Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), while officials generally will be accorded "good faith" immunity, See Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). See generally McCormack, Federalism and Section 1983: Limitations on Judicial Enforcement of Constitutional Provisions, 60 Va.L.Rev. 1 (1974)
 
 
 [6]
 This growing trend has not gone unnoticed in the literature. See, e.g., Hundt, Suing Municipalities Directly Under the Fourteenth Amendment, 70 Nw.U.L.Rev. 770 (1975); Comment, Implying a Damage Remedy Against Municipalities Directly Under the Fourteenth Amendment: Congressional Action as an Obstacle to Extension of the Bivens Doctrine, 36 Md.L.Rev. 123 (1976); Note, Municipal Liability in Damages for Violations of Constitutional Rights Fashioning a Cause of Action Directly from the Constitution Brault v. Town of Milton, 7 Conn.L.Rev. 552 (1975)
 
 
 [7]
 See Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv.L.Rev. 1532, 1535 & n.20 (1972). The Federal Tort Claims Act was subsequently amended, effective March 16, 1974, to allow suits for claims arising out of, Inter alia, assault, battery, and false arrest. Pub.L. 93-253, § 2, 88 Stat. 50, Codified at 28 U.S.C. § 2680(h) (Supp. V 1975)
 
 
 [8]
 Judge Van Graafeiland caustically suggests that he and the majority are interpreting "different" constitutions. To the extent that the Constitution relied on by the dissenting opinion ignores the very existence of Bivens, we cannot take issue with what we assume is intended as a taunting characterization of the difference between us. Indeed, this court's opinion in Fisher v. City of New York, 312 F.2d 890 (2d Cir.), Cert. denied, 374 U.S. 828, 83 S.Ct. 1866, 10 L.Ed.2d 1051 (1963), has lost all force and effect because the Supreme Court, eight years after Fisher, unequivocably concluded that damage actions can be implied directly from the Constitution
 My brother Van Graafeiland would obviously feel more at ease if the Constitution were of such specificity that it could remain unaffected by the passage of time. But the fact, as the dissenting opinion notes, that the Constitution was drawn "with purposed vagueness so as to leave room for the unfolding future," Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 491, 59 S.Ct. 595, 604, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring), is, in our view, part of the fundamental structure of our democracy. That the developing interpretation of constitutional rights has reached the point where remedies are available for conduct which "shocks the conscience" or conflicts with "traditional notions of fair play and substantial justice" is hardly a cause for alarm or regret.
 
 
 [9]
 E.g., Paton v. Le Prade, 524 F.2d 862, 869-70 (3d Cir. 1975)
 
 
 [10]
 E.g., Apton v. Wilson, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974); United States ex rel. Moore v. Koelzer, 457 F.2d 892 (3d Cir. 1972)
 
 
 [11]
 Berlin Democratic Club v. Rumsfeld, 410 F.Supp. 144 (D.D.C.1976)
 
 
 [12]
 E.g., Patmore v. Carlson, 392 F.Supp. 737 (E.D.Ill.1975); Walker v. McCune, 363 F.Supp. 254 (E.D.Va.1973)
 
 
 [13]
 Howard v. Warden, Petersburg Reformatory, 348 F.Supp. 1204 (E.D.Va.1972), Appeal dismissed, 474 F.2d 1341 (4th Cir. 1973)
 
 
 [14]
 E.g., Owen v. City of Independence, 560 F.2d 925 (8th Cir. 1977); Reeves v. City of Jackson, 532 F.2d 491 (5th Cir. 1976); Hostrop v. Board of Junior College District 515, 523 F.2d 569 (7th Cir. 1975); Amen v. City of Dearborn, 532 F.2d 554 (6th Cir. 1976)
 
 
 [15]
 It is possible that either or both of these requirements might be constitutionally compelled. Whether provided by Congress or the courts, the Constitution may require that its provisions be accorded a minimal level of remedial protection. Cf. Kostka v. Hogg, 560 F.2d 37, 44 (1st Cir. 1977)
 
 
 [16]
 The dissenting opinion derides the majority effort to resolve the troublesome issue before us by resorting to the familiar slogan, "judicial legislation." It has been this writer's experience that the term "judicial legislation" is applied when the conclusion is in disfavor with an author, but the phrase "judicial interpretation" is used when it meets with approval
 
 
 [17]
 The dissenting opinion suggests that our holding will relegate Congress to "mopping-up-after-the-Second-Circuit." Certainly, if the "American people", on whose behalf Judge Van Graafeiland presumes to speak with special insight, are sufficiently dissatisfied with our holding today, legislation can be enacted to alter its effect. We are loath to predict the public will, however. In any event, we somehow suspect that our dissenting brother would not consider congressional inaction in the face of our holding a ringing endorsement of the majority view, as he seems to view the inaction after Monroe v. Pape
 
 
 [18]
 Remarks of Senator Luke Poland (R. Vt., and for many years Chief Justice of that state) during the Senate debates on the fourteenth amendment, Reprinted in 1 B. Schwartz, Statutory History of the United States, Civil Rights 272 (1970) (hereinafter cited as Statutory History )
 
 
 [19]
 The fourteenth amendment reads, in relevant part:
 Sec. 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.
 Sec. 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.
 
 
 [20]
 See Mahone v. Waddle, 564 F.2d 1018, 1059 (3d Cir. 1977) (Garth, J., dissenting)
 
 
 [21]
 The dissenting opinion relies on Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), to bolster its argument that the dicta from Ex parte Virginia Retains validity. In fact, Fitzpatrick supports the holding of this court. The Supreme Court there noted that "the substantive provisions of the Fourteenth Amendment . . . themselves embody significant limitations on state authority," even in the absence of congressional legislation. Id. at 456, 96 S.Ct. at 2671
 
 
 [22]
 One commentator has attempted to draw such a distinction. His analysis relies on the fact that during the debates on the fourteenth amendment, members of Congress adverted to the judiciary's equitable powers to enforce provisions of the Constitution but failed to mention the ability of federal courts to entertain damage actions. Nowak, The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments, 75 Colum.L.Rev. 1413, 1455-60 (1975) (hereinafter cited as Nowak, Congressional Power). We find this "negative implication" argument hardly compelling. Since it is highly unlikely that damage actions were discussed during the adoption of the Bill of Rights, Professor Nowak's argument would equally well suggest a reversal of Bivens itself
 
 
 [23]
 Introduced before the House of Representatives by John Bingham, Republican of Ohio, the provision read:
 The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property. Statutory History, supra, at 193.
 
 
 [24]
 The limitations on federal power contained in the eleventh amendment are not at issue in this case. Municipalities and other political subdivisions of a state are not within the scope of that provision. See, e.g., Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890)
 
 
 [25]
 It is equally clear that the tenth amendment concerns discussed in National League of Cities Are not implicated here. The Court there struck down federal wage and hour regulations, insofar as they applied to state and local employees. In doing so, it noted that there were certain "attributes of state sovereignty" which are essential to the separate and independent existence of the states, and cannot be abrogated by congressional action pursuant to the commerce clause. 426 U.S. at 845-46, 96 S.Ct. 2465
 In contrast, the question before us is whether municipalities should be liable in damages for the constitutional wrongs committed by their agents. We readily reject the notion that a municipality possesses a sovereign, constitutionally-protected right to remain totally immune from the consequences of constitutional violations committed by its employees in the course of their duties, at least when the municipality itself has become implicated in that wrongdoing.
 
 
 [26]
 One observer has ascribed the defeat of the Sherman Amendment to the House's belief that "a milder course of action . . . should be followed first." Nowak, Congressional Power, supra, 75 Colum.L.Rev. at 1468. This interpretation suggests that it would be improper to view the Amendment's rejection as an indication of Congress's belief that municipal liability should forever be precluded
 
 
 [27]
 It is not without significance that the Moor opinion was written by Justice Marshall, with Justice Brennan concurring, although both have elsewhere indicated that they would allow an implied right of action against municipalities under the fourteenth amendment. City of Kenosha v. Bruno, 412 U.S. 507, 516, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) (Brennan, Marshall, JJ., concurring)
 
 
 [28]
 Many of these measures are catalogued in Judge Garth's dissenting opinion in Mahone v. Waddle, 564 F.2d 1018, 1061 (3d Cir. 1977)
 
 
 [29]
 A number of the bills would have imposed liability upon municipalities for all constitutional wrongs committed by their employees, under a theory of Respondeat superior. H.R. 10876, introduced in the 90th Congress, 1st Session, which would have added the following paragraph to § 1983, is representative:
 Every city, county, or political subdivision of a State or territory which has in its employ a person who, under color of any statute, ordinance, regulation, custom, or usage of such State, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress to the same extent as the person employed is liable to the party injured.
 A bill entitled "The Civil Rights Improvements Act", which would define a much narrower scope of municipal liability, is currently before Congress. S. 35, and its House counterpart, H.R. 4514, both introduced in the 95th Congress, would amend § 1983 to include municipalities as "persons", and would add the following new subdivision:
 (c) Notwithstanding any other provision of this section, no State, municipality, or any agency or unit of government thereof shall be liable for damages or subject to an injunction under the provisions of this section for any violation of the provisions of this section by any officer or employee of such State, municipality, agency, or unit of government unless
 (1) the officer or employee of such State, municipality, or unit of government responsible for the conduct of the subordinate officer or employee who committed such violation
 (A) directed, authorized, approved, or encouraged any action by such subordinate officer or employee which resulted in such violation, or
 (B) failed to act in any manner to remedy a pervasive pattern of unconstitutional or unlawful conduct engaged in by such subordinate officer or employee which, in the absence of any remedial action, was likely to continue or recur in the future; or
 (2) the party seeking such damages or injunction establishes that one or more officers or employees of such State, municipality, agency, or unit of government engaged in grossly negligent conduct in violation of the provisions of this section, but cannot identify such officer or employee or prove causation with regard to any such officer or employee.
 
 
 [30]
 See generally Powell, The Still Small Voice of the Commerce Clause, in 3 Selected Essays on Constitutional Law 931, 932 (1938)
 
 
 [31]
 City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), similarly cannot be read as holding anything more than that the question of implying remedies against municipalities under the fourteenth amendment is an open one. The Court remanded a suit against two cities under the fourteenth amendment for a determination of whether the $10,000 jurisdictional amount of 28 U.S.C. § 1331 had been met. Its action would appear to suggest little more than that § 1331 jurisdiction authorizes a district court to determine the existence of a cause of action. Justices Marshall and Brennan, in expressing their view that such an action existed, did so in a separate concurrence, 412 U.S. at 516, 93 S.Ct. 2222, which supports the conclusion that the majority opinion did not reach that issue
 
 
 [32]
 "For we have here no explicit congressional declaration that persons injured by A federal officer's violation of the Fourth Amendment may not recover money damages From the agents . . . ." 403 U.S. at 397, 91 S.Ct. at 2005 (emphasis added)
 
 
 [33]
 The dissent erroneously raises the specter that "open-ended" and "indefinite" liability will be imposed upon municipalities for virtually any constitutional violation as a result of our decision. Our holding, however, merely recognizes that one specific constitutional interest freedom from unlawful arrests merits a remedy in damages. In so doing, we do no more than apply the well-reasoned conclusion of the Supreme Court in Bivens. Accordingly, we cannot conceive of any difference, let alone the "vast difference" suggested by the dissenting opinion, in the scope of the causes of action created here and in Bivens
 The appropriateness of damage remedies for violations of other constitutional interests whether directly or as made applicable to the states through the fourteenth amendment's due process clause, must await decision in future cases presenting those issues squarely. See, e.g., Davis v. Passman, 571 F.2d 793 (5th Cir. 1978) (en banc) (finding damage remedy inappropriate for a violation of the fifth amendment due process clause).
 
 
 [34]
 In so stating, we do not mean to imply that a municipality cannot by itself, violate the Constitution, even where no individual employee is guilty of having behaved in an unconstitutional manner
 
 
 [35]
 An analogy can be drawn to the treatment of corporations and partnerships, which are themselves considered principals in a variety of circumstances. See 1 Restatement of Agency 2d, Ch. 7, at 454 (1957)
 
 
 [36]
 Indeed, we are not aware of any federal Court of Appeals which has held that a damage action should not be implied from the fourteenth amendment where the municipality itself was responsible for the unconstitutional action. See, e.g., Owen v. City of Independence, 560 F.2d 925, 933 & n.9 (8th Cir. 1977); Roane v. Callisburg Independent School District, 511 F.2d 633, 635 n.1 (5th Cir. 1975); Hanna v. Drobnick, 514 F.2d 393, 398 (6th Cir. 1975); Hostrop v. Board of Junior College District No. 515, 523 F.2d 569, 576-77 (7th Cir. 1975); Gray v. Union County Intermediate Education District, 520 F.2d 803, 805 (9th Cir. 1975)
 Moreover, the rationale behind the imposition of liability in this instance comports with that applied in Johnson v. Glick, 481 F.2d 1028 (2d Cir. 1973), where we held that only supervisory personnel responsible for unconstitutional behavior could be held liable in damages under § 1983. See also Rizzo v. Goode, 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).
 
 
 [37]
 The municipality, acting in its role as "principal", has itself committed a wrong distinct from that of its employee-agent:
 A master or other principal may be liable for harm caused to a third person by the conduct of servants or other agents because of rules imposing liability upon persons for the behavior of those acting for them. On the other hand, he may be liable because he has been personally guilty of wrongful conduct, as where he directs his servants to do an act which, if done by himself, would be an intentional wrong, or because he is personally negligent, as where he fails to exercise reasonable care in employing careful and competent servants for the performance of dangerous work, or fails to exercise the control which his position as master or principal gives him over their actions.
 Scope Note, 1 Restatement of Agency 2d, Ch. 7, at 453-54. As the Restatement goes on to observe, liability under these circumstances is Not derivative, but stems from an application of principles of tort law to the master's own conduct. Id. at 454; § 212, Comment a, at 455; § 213, Comment a, at 458.
 
 
 [38]
 The dissenting opinion suggests that, as a result of the court's holding, municipal treasuries throughout the country will be raided. The care we have taken to circumscribe the remedy here created is evidence this vision is unrealistic. In any event, fiscal considerations alone cannot stand in the way of the vindication of constitutional rights. Courts have placed significant fiscal burdens on governmental entities in efforts to desegregate schools, See Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) and in affording a right to counsel, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) to name but two instances
 In discussing its solicitude for the municipal fisc, the dissenting opinion sadly finds it necessary to resort to another old and discredited slogan. The hardly judicious suggestion is made that the majority's determination will result in the "exacerbation of social friction." It appears to us that, upon reflection, the dissenting opinion would be loath to characterize many landmark opinions guaranteeing basic constitutional rights to the underprivileged and under-represented in this fashion.
 
 
 [39]
 Nor do the facts of this case call for a determination whether a form of "legislative" immunity is appropriate in lawsuits arising from the passage of a law that is subsequently declared unconstitutional
 
 
 [40]
 The Court in Monroe noted that it did not "reach the constitutional question whether Congress has the power to make municipalities liable for the acts of its officers that violate the civil rights of individuals." 365 U.S. at 191, 81 S.Ct. at 486. Presumably if the power of Congress is in doubt, notwithstanding its express authorization to enforce the fourteenth amendment, the ability of courts to impose vicarious liability is even more problematical
 
 
 [41]
 Since the complaint was dismissed at the pleading stage, we must take the allegations as true. See, e.g., Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); Escalera v. New York City Housing Authority, 425 F.2d 853, 857 (2d Cir. 1970)
 
 
 [1]
 Ordinary tort liability for negligence has traditionally been imposed on municipal corporations exercising proprietary as distinguished from governmental functions. 63 C.J.S. Municipal Corporations § 746, at 32 (1950 & Supp.1977). At least 40 states permit such liability against their municipalities. Id. at 32 n.26 (1950 & Supp.1977). And of these 40 states, at least 5 have abolished immunity from tort liability altogether. Id. at 32 n.13 (Supp.1977). See Comment, Judicial Abrogation of Governmental and Sovereign Immunity: A National Trend with a Pennsylvania Perspective, 78 Dick.L.Rev. 365 (1973)
 
 
 [2]
 For these rights and the many substantive and procedural limitations on them, see 1 N. Dorsen, P. Bender & B. Neuborne, Political and Civil Rights in the United States (4th ed. 1976)
 
 
 [3]
 Rostow, The Democratic Character of Judicial Review, 66 Harv.L.Rev. 193 (1952), is about as far removed from R. Berger, Government by Judiciary (1977), as Ralph Waldo Emerson is from Franz Kafka
 
 
 [4]
 B. Cardozo, The Nature of the Judicial Process 92-93 (1921)
 
 
 [5]
 Id. at 124
 
 
 [6]
 Even if the $10,000 jurisdictional amount were eliminated, See post at n.1, a prospect by no means certain, the dissent has ignored the other limitations on the right to damages discussed above
 
 
 [7]
 See Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv.L.Rev. 1532 (1972)
 
 
 [8]
 The minority suggests, See post at n.87, that Professor Tribe's "consent" is consent of the governed in the constitutional sense; plainly, however, Professor Tribe is referring to consent in the executive and legislative context
 
 
 [9]
 See Dworkin, Hard Cases, 88 Harv.L.Rev. 1957 (1975). The dissent also tacitly concedes the value judgment thesis by its footnote 3 reference to Miller & Howell, The Myth of Neutrality in Constitutional Adjudication, 27 U.Chi.L.Rev. 661 (1960)
 
 
 [1]
 We are not advised by our Brothers whether the State Courts of New York, Connecticut and Vermont must follow in their footsteps, or whether this is a uniquely federal cause of action. Compare Mapp v. Ohio, 367 U.S. 643, 657, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), And Copper v. Aaron, 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), With Stone v. Powell, 428 U.S. 465, 482-86, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). See also H. Monaghan, The Supreme Court 1974 Term Foreword: Constitutional Common Law, 89 Harv.L.Rev. 1, 38-40 (1975). Of course, there is no monetary jurisdictional limit which must be met in the state courts. Indeed, if H.R. 9622, which was passed by the House on February 28, 1978, is enacted into law, the amount in controversy requirement will be eliminated from all federal question cases in the federal courts
 
 
 [2]
 "Judicial review is inherently adapted to preserving broad and flexible lines of constitutional growth, not to operate as a continuously active factor in legislative or executive decisions." E. Rostow, The Democratic Character of Judicial Review, 66 Harv.L.Rev. 193, 198 (1952)
 
 
 [3]
 A. Miller & R. Howell, The Myth of Neutrality in Constitutional Adjudication, 27 U.Chi.L.Rev. 661, 683 (1960)
 
 
 [4]
 See A. Bickel, The Least Dangerous Branch 92 (1962). Professor Forrester writes that the time has come for candor; that if judges are not basing their decisions on law in any usual sense but "are, in fact, legislating under the guise of judging," they should be frank and say so. W. Forrester, Are We Ready for Truth in Judging?, 63 A.B.A.J. 1212 (1977)
 
 
 [5]
 Griswold v. Connecticut, 381 U.S. 479, 501, 85 S.Ct. 1678, 1691, 14 L.Ed.2d 510 (1965) (Harlan, J., concurring)
 
 
 [6]
 "Clio (the muse of history) deserves no throne; but may she not claim a corner seat at the conference table?" L. Henken, Some Reflections on Current Constitutional Controversy, 109 U.Pa.L.Rev. 637, 657 (1961)
 
 
 [7]
 "That all lawful power derives from the people and must be held in check to preserve their freedom is the oldest and most central tenet of American constitutionalism." L. Tribe, American Constitutional Law 1-2 (1978)
 
 
 [8]
 National Mutual Insurance Co. v. Tidewater Transfer Co., 337 U.S. 582, 647, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (Frankfurter, J., dissenting); See also R. Berger, Government by Judiciary 303 (1977)
 
 
 [9]
 P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 7-8 (2d ed. 1973); Berger, Supra note 8, 300-11; See also Griswold v. Connecticut, 381 U.S. 479, 513 n.6 (1965) (Harlan, J., concurring)
 
 
 [10]
 "It is the duty of a judge to administer, not to make laws." Lofft, No. 42 (1790). The following quotations also illustrate the centuries-old English tradition of judicial restraint:
 Though in many other countries everything is left in the breast of the Judge to determine, yet with us he is only to Declare and Pronounce, not to Make or New-model, the law.
 
 
 [3]
 W. Blackstone, Commentaries * 335
 We cannot make a law, we must go according to the law. That must be our role and direction.
 Parkyns' Case, 13 How.St.Tr. 72 (1696) (per Holt, C. J.).
 
 
 [11]
 1 Farrand, The Records of the Federal Convention 97-98, 109 (1911) (quoted in Hart and Wechsler, Supra note 9, at 8)
 Alexander Hamilton thought, somewhat naively, it turns out, that judicial encroachment upon legislative authority could be prevented through the impeachment process. See Federalist No. 81 at 526-27 (quoted in Berger, Supra note 8, at 294).
 
 
 [12]
 Trop v. Dulles, 356 U.S. 86, 119, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (Frankfurter, J., dissenting); United States v. Butler, 297 U.S. 1, 79, 56 S.Ct. 312, 80 L.Ed. 477 (1936) (Stone, J., dissenting)
 
 
 [13]
 See, e. g., Harper v. Virginia Board of Elections, 383 U.S. 663, 677-78, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (Black, J., dissenting)
 
 
 [14]
 See Berger, Supra note 8, 312-37; Tribe, Supra note 7, 446-49; A. Miller & R. Howell, Supra, 27 U.Chi.L.Rev. at 674; See also Griswold v. Connecticut, 381 U.S. 479, 522-27, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Black, J., dissenting)
 
 
 [15]
 See Berger, Supra note 8; Bickel, Supra note 4; L. Hand, The Bill of Rights (1958); Henken, Supra, 109 U.Pa.L.Rev. 367
 
 
 [16]
 "The critics start from the assumption that, in a political society which aspires to representative democracy or at least to popular representation, exercises of power which cannot find their justification in the ultimate consent of the governed are difficult, if not impossible to justify." Tribe, Supra note 7, at 48
 
 
 [17]
 H. Monaghan, Supra note 1, 89 Harv.L.Rev. 1 (1975)
 
 
 [18]
 Id. at 29
 
 
 [19]
 Like the Supreme Court in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 407 n.7, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring), the majority carefully refrain from identifying that portion of their holding which is subject to "reversal" by Congress. As Congress would have to be painfully aware, any determination that it makes in this regard could be promptly overruled by this Court
 
 
 [20]
 Oregon v. Mitchell, 400 U.S. 112, 154-55, 91 S.Ct. 260, 280, 27 L.Ed.2d 272 (1970) (Harlan, J., concurring and dissenting)
 
 
 [21]
 In District of Columbia v. Carter, 409 U.S. 418, 423, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1973), the Court stated that "the primary purpose of the 1871 Act was 'to enforce the Provisions of the Fourteenth Amendment.' " The language which the Court quoted was taken from the caption of the Act itself. See 17 Stat. 13
 
 
 [22]
 See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 436, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); Hurd v. Hodge, 334 U.S. 24, 32-33, 68 S.Ct. 847, 92 L.Ed. 1187 (1948)
 
 
 [23]
 See Oregon v. Mitchell, 400 U.S. 112, 160, 91 S.Ct. 260, 283, 27 L.Ed.2d 272 (1970) (Harlan, J., concurring and dissenting)
 
 
 [24]
 See Adamson v. California, 332 U.S. 46, 102, 67 S.Ct. 1672, 1701, 91 L.Ed. 1903 (1947) (Black, J., dissenting)
 
 
 [25]
 Id. at 104, 67 S.Ct. at 1702 (emphasis in original)
 
 
 [26]
 See Katzenbach v. Morgan, 384 U.S. 641, 648 n. 8, 86 S.Ct. 1717, 1722, 16 L.Ed.2d 828 (1966)
 
 
 [27]
 Adamson v. California, 332 U.S. at 110, 67 S.Ct. at 1705 (Black, J., dissenting) (quoting Flack, The Adoption of the Fourteenth Amendment 153-54 (1908)); See also Berger, Supra note 8 at 225-29
 
 
 [28]
 We, of course, do not suggest that the judiciary may never enforce the Fourteenth Amendment. See, e.g., Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). We simply believe that § 5 places primary responsibility for enforcement on Congress and that at least where Congress has indicated an intent, that policy ought to be respected by the courts. See Kostka v. Hogg, 560 F.2d 37, 42-43 (1st Cir. 1977)
 
 
 [29]
 District of Columbia v. Carter, 409 U.S. 418, 423, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973)
 
 
 [30]
 The Supreme Court has found that the legislative history of this Act wholly rejects the notion that municipalities can be held liable:
 The response of the Congress to the proposal to make municipalities liable for certain actions being brought within federal purview by the Act of April 20, 1871, was so antagonistic that we cannot believe that the word "person" was used in this particular Act to include them.
 Monroe v. Pape, supra, 365 U.S. at 191, 81 S.Ct. at 486 (footnote omitted).
 This view was reiterated more recently in Moor v. County of Alameda, where the Court stated:
 (T)he proposal was rejected In toto, and from this action we cannot infer any congressional intent other than to exclude all municipalities . . . from the civil liability created in the Act of April 20, 1871 and § 1983.
 411 U.S. 693, 710, 93 S.Ct. 1785, 1796, 36 L.Ed.2d 596 (1973) (emphasis in original) (footnote omitted).
 
 
 [31]
 Moor v. County of Alameda, 411 U.S. 693, 709, 93 S.Ct. 1785, 1796, 36 L.Ed.2d 596 (1973)
 
 
 [32]
 S. 2983, 87th Cong., 2d Sess. (1962) (sponsored by Sen. Hart); H.R. 10120, 87th Cong., 2d Sess. (1962) (sponsored by Rep. Dingell); H.R. 10951, 87th Cong., 2d Sess. (1962) (sponsored by Rep. Diggs); S. 1215, 88th Cong., 1st Sess. (1963) (sponsored by Sen. Javits); H.R. 3932, 88th Cong., 1st Sess. (1963) (sponsored by Rep. Dingell); H.R. 6030, 88th Cong., 1st Sess. (1963) (sponsored by Rep. Ryan); H.R. 630, 88th Cong., 1st Sess. (1963) (sponsored by Rep. Moorehead); H.R. 6334, 88th Cong., 1st Sess. (1963) (sponsored by Rep. Hawkins); H.R. 5427, 89th Cong., 1st Sess. (1965) (sponsored by Rep. Ryan); H.R. 10876, 90th Cong., 1st Sess. (1967) (sponsored by Rep. Diggs); H.R. 8396, 92d Cong., 1st Sess. (1971) (sponsored by Rep. Ryan; see also his remarks at 117 Cong.Rec. 14918-23 (1971)); H.R. 11827, 93d Cong., 1st Sess. (1973) (sponsored by Rep. Metcalfe; see also his remarks at 119 Cong.Rec. 39929-30 (1973)); H.R. 549, 95th Cong., 1st Sess. (1977) (sponsored by Rep. Metcalfe); H.R. 5535, 95th Cong., 1st Sess. (1977) (sponsored by Rep. Metcalfe); H.R. 4514, 95th Cong., 1st Sess. (1977) (sponsored by Rep. Mitchell); H.R. 6151, 95th Cong., 1st Sess. (1977) (sponsored by Rep. Mitchell); H.R. 6677, 95th Cong., 1st Sess. (1977) (sponsored by Rep. Mitchell); H.R. 7520, 95th Cong., 1st Sess. (1977) (sponsored by Rep. Mitchell); S. 35, 95th Cong., 1st Sess. (1977) (sponsored by Sen. Mathias) (amended for clarification, 123 Cong.Rec. S16560-61 (daily ed. Oct. 6, 1977)); See also S.Rep.No. 26, 95th Cong., 1st Sess. 12-13 (1977); Causes of Popular Dissatisfaction with the Administration of Justice: Hearings Before the Subcom. on Constitutional Rights of the Senate Comm. on the Judiciary, 94th Cong., 2d Sess. 62 (1976)
 
 
 [33]
 Supra note 32
 
 
 [34]
 124 Cong.Rec. D117 (daily ed. Feb. 8, 1978); Id. D129 (daily ed. Feb. 9, 1978)
 
 
 [35]
 The Civil Rights Act of 1964, Pub.L.No. 88-352, 78 Stat. 241 (1964); Act of April 11, 1968, Pub.L.No. 90-284, 82 Stat. 73 (prescribing criminal penalties for violations of civil rights); Act of Nov. 25, 1970, Pub.L.No. 91-521, 84 Stat. 1356 (1970) (authorizing appropriations for Civil Rights Commission, and amending Civil Rights Act of 1957); Equal Employment Opportunity Act of 1972, Pub.L.No. 92-261, 86 Stat. 103 (1972); Education Amendments of 1972, Pub.L.No. 92-318, 86 Stat. 235 (1972); Act of Oct. 14, 1972, Pub.L.No. 92-496, 86 Stat. 813 (1972) (authorizing appropriations for Civil Rights Commission, and amending Civil Rights Act of 1957); The Civil Rights Attorney's Fees Awards Act of 1976, Pub.L.No. 94-559, 90 Stat. 2641 (slip ed. Oct. 19, 1976)
 
 
 [36]
 Pub.L.No. 88-352, 78 Stat. 253 (1964)
 
 
 [37]
 H.Rep. 238, 92d Cong., 1st Sess., Reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 2137, 2152-54
 
 
 [38]
 42 U.S.C. § 2000e(a) (Supp. V 1975)
 
 
 [39]
 See Mahone v. Waddle, 564 F.2d 1018, 1060 (3d Cir. 1977) (Garth, J., dissenting and concurring)
 
 
 [40]
 403 U.S. at 397, 91 S.Ct. at 2005
 
 
 [41]
 See note 30, Supra
 "It is one thing for the Court to authorize damages where Congress has not spoken to the question, but it is quite another for it to do so where Congress has." M. Yudof, Liability for Constitutional Torts and the Risk Averse Public School Official, 49 S.Cal.L.Rev. 1322, 1356 (1976).
 
 
 [42]
 See Aldinger v. Howard, 427 U.S. 1, 4 n.2, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976)
 
 
 [43]
 Judges have, of course, the power, though not the right, to ignore the mandate of a statute, and render judgment in despite of it. They have the power, though not the right, to travel beyond the walls of the interstices, the bounds set to judicial innovation by precedent and custom. Nonetheless, by that abuse of power, they violate the law. B. Cardozo, The Nature of the Judicial Process 129 (1921)
 
 
 [44]
 Id. at 102
 
 
 [45]
 See J. Nowak, The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments, 75 Colum.L.Rev. 1413, 1428-29 (1975)
 
 
 [46]
 Id. at 1444
 
 
 [47]
 City of Kenosha v. Bruno, 412 U.S. 507, 519, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) (appendix to opinion of Douglas, J., dissenting in part)
 
 
 [48]
 See, e.g., National League of Cities v. Usery, 426 U.S. 833, 846-52, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); G. Frug, The Judicial Power of The Purse, 126 U.Pa.L.Rev. 715 (1978); Cf. Ingraham v. Wright, 430 U.S. 651, 682, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); Mathews v. Eldridge, 424 U.S. 319, 347-48, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). But see City of Lafayette v. Louisiana Power & Light Co., --- U.S. ----, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (upholding anti-trust remedies against cities acting in a proprietary capacity)
 
 
 [49]
 --- U.S. ----, ----, 98 S.Ct. 1123, 1152, 55 L.Ed.2d 364 (1978) (Blackmun, J., dissenting)
 
 
 [50]
 Approximately 50 per cent of the cities with populations over 500,000, and 25 per cent of those over 50,000, are reportedly in economic distress. See U.S. News and World Report 211 (April 10, 1978). The financial problems of our largest metropolis, New York City, are matters of common knowledge
 
 
 [51]
 Incantation of the talismanic word "insurance" will not make the financial plight of municipalities disappear. Insurance does not drop like manna from heaven. Every dollar and more that an insurance company pays out, it takes in. Insurance premiums for municipalities have risen drastically in recent years, and in some instances carriers have refused to write municipal liability insurance altogether. When the door is opened wide to class litigation seeking damages for alleged Fourteenth Amendment violations, insurance coverage, if available at all, will be at a cost commensurate with the risk
 
 
 [52]
 H. Friendly, Federalism: A Foreword, 86 Yale L.J. 1019, 1027 (1977)
 
 
 [53]
 Shaffer v. Heitner, 433 U.S. 186, 206, 207, 212, 97 S.Ct. 2569, 2584, 53 L.Ed.2d 683 (1977)
 
 
 [54]
 Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952)
 
 
 [55]
 Haley v. Ohio, 332 U.S. 596, 604, 68 S.Ct. 302, 306, 92 L.Ed. 224 (1948) (Frankfurter, J., concurring)
 
 
 [56]
 In Davis v. Passman, 571 F.2d 793, 799 (5th Cir. 1978) (en banc), where the court refused to imply a damage remedy under the due process clause of the Fifth Amendment, it said: "(In fact,) the breadth of the concept of due process indicates that the damage remedy sought will not be judicially manageable and that there is simply no way a court can judge whether this remedy will be appropriate for securing the right in future situations."
 
 
 [57]
 See F. Frankfurter, Memorandum on "Incorporation" of the Bill of Rights into the Due Process Clause of the Fourteenth Amendment, 78 Harv.L.Rev. 746, 749-54 (1965)
 
 
 [58]
 Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 491, 59 S.Ct. 595, 604, 83 L.Ed. 927 (1939) (Frankfurter, J., concurring)
 
 
 [59]
 Id
 
 
 [60]
 New York v. United States, 326 U.S. 572, 590, 66 S.Ct. 310, 90 L.Ed. 326 (1946) (Douglas, J., dissenting); Burnet v. Coronado Oil & Gas Co., 285 U.S. 393, 405-13, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting)
 
 
 [61]
 Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954)
 
 
 [62]
 See Lewis v. Cohen, 417 F.Supp. 1047, 1051-55 (E.D.Pa.1976)
 
 
 [63]
 "It is far too late in the day to contend that the Fourteenth Amendment prohibits only racial discrimination; and to me, singling out the poor to bear a burden not placed on any other class of citizens tramples the values that the Fourteenth Amendment was designed to protect." James v. Valtierra, 402 U.S. 137, 145, 91 S.Ct. 1331, 1335, 28 L.Ed.2d 678 (1971) (Marshall, J., dissenting); See also San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)
 
 
 [64]
 Kennedy Park Homes Association v. City of Lackawanna, 436 F.2d 108, 112-13 (2d Cir. 1970), Cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 929 (2d Cir. 1968)
 
 
 [65]
 Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945)
 
 
 [66]
 1977 Annual Report of the Director of the Administrative Office of the United States Courts table 11 at 82 (prelim. ed.)
 
 
 [67]
 Id
 
 
 [68]
 Id., table B7 at A-10
 69 U.S. News & World Report, April 3, 1978, at 39.
 
 
 [70]
 In In re United States, 565 F.2d 19 (2d Cir. 1977), which has been bouncing between the Southern District and this Court since 1973, See Socialist Workers Party v. Attorney General, 510 F.2d 253 (2d Cir. 1974), damages of some forty million dollars are demanded from various officials of the government and the F.B.I
 
 
 [71]
 Note, Damage Remedies Against Municipalities for Constitutional Violations, 89 Harv.L.Rev. 922, 958 (1976). The limited immunity concept is simply another way of saying that the Constitution mandates recovery from municipalities by some people, but not by all. It undercuts the whole argument in favor of a constitutional right of recovery
 
 
 [72]
 B. Cardozo, The Gravity of Law 116-17 (1924)
 
 
 [73]
 In his article, Federalism: A Foreword, supra, 86 Yale L.J. at 1027-28, Judge Friendly discusses the great increase in federal court supervision of state institutions and the imposition of affirmative obligations on the states. He concludes with the observation, "The risks of confrontation are serious."
 
 
 [74]
 Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)
 
 
 [75]
 Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)
 
 
 [76]
 Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)
 
 
 [77]
 Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); See also O'Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)
 
 
 [78]
 See Owen v. City of Independence, 560 F.2d 925, 934 (8th Cir. 1977); Kostka v. Hogg, 560 F.2d 37, 41 (1st Cir. 1977); Hander v. San Jacinto Junior College, 519 F.2d 273, 277 (5th Cir. 1975); See also Hostrop v. Board of Junior College, 523 F.2d 569 (7th Cir. 1975), Cert. denied, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976) (school board held liable despite good faith of individual members)
 
 
 [79]
 Wood v. Strickland, 420 U.S. 308 (1975); Id. at 329, 95 S.Ct. 992, 43 L.Ed.2d 214 (Powell, J., concurring and dissenting); Rochin v. California, 342 U.S. 165, 170, 72 S.Ct. 205, 96 L.Ed. 183 (1952)
 
 
 [80]
 There are those who advocate that municipalities should be held liable for erroneous constitutional decisions by its judges. See J. Newman, Suing the Law Breakers: Proposals to Strengthen the Section 1983 Damage Remedy for Law Enforcers' Misconduct, 87 Yale L.J. 447, 462-63 (1978)
 
 
 [81]
 Municipalities need not be as lawless as historic Tombstone, Arizona to enact ordinances which violate the Fourteenth Amendment. No one would suggest that Skokie, Illinois is a lawless community. However, See Collin v. Smith, Dkt. Nos. 78-1381, 78-1385, --- F.2d ---- (7th Cir. May 22, 1978) And Village of Skokie v. National Socialist Party of America, 69 Ill.2d 605, 14 Ill.Dec. 890, 373 N.E.2d 21 (1978); See also Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); Papachristou v. City of Jacksonville, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed. 943 (1967); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)
 
 
 [82]
 See City of Lafayette v. Louisiana Power & Light Co., --- U.S. ----, ----, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (Blackmun, J., dissenting)
 
 
 [83]
 Cf. id. at ----, 98 S.Ct. 1123 (Stewart, J., dissenting); Id. at ----, 98 S.Ct. 1123 (Blackmun, J., dissenting); National League of Cities v. Usery, 426 U.S. 833, 847, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); Rizzo v. Goode, 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); Younger v. Harris, 401 U.S. 37, 44-45, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)
 
 
 [84]
 "(I)t is indeed an odd business that it has taken this Court nearly two centuries to 'discover' (the) constitutional mandate" which compels its present decision. Coleman v. Alabama, 399 U.S. 1, 22, 90 S.Ct. 1999, 2010, 26 L.Ed.2d 387 (1970) (Burger, C. J., dissenting)
 
 
 [85]
 Oregon v. Mitchell, 400 U.S. 112, 247-48, 91 S.Ct. 260, 327, 27 L.Ed.2d 272 (1970) (Brennan, J., concurring and dissenting)
 
 
 [86]
 Id. at 207, 91 S.Ct. at 306 (Harlan, J., concurring and dissenting)
 
 
 [87]
 Tribe, Supra note 7, at 51
 We likewise decline to join our Brother Oakes in endorsing the philosophy that, so far as the judicial branch of the government is concerned, "it cannot be consent which is the sole touchstone of legitimacy." We are content to adhere to the old-fashioned but not out-moded doctrine that ours is a government "by the people, for the people."
 
 
 [88]
 That decisions on constitutional issues should be avoided whenever possible is an established principle of constitutional adjudication. Spector Motor Co. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944); Fine v. City of New York, 529 F.2d 70, 76 (2d Cir. 1975). Disregard of this principle, as in Gentile v. Wallen, 562 F.2d 193 (2d Cir. 1977) does not inspire confidence that future adjudications in this area of the law will be marked by judicial restraint
 
 
 [89]
 New York Times, Apr. 16, 1978, at 24, Col. 2